OLIVER HUDSON *v.* STATE OF MARYLAND

[No. 61, September Term, 1979.]

*Decided December 21, 1979.*

The cause was argued before MURPHY, C. J., and SMITH, DIGGES, ELDRIDGE, ORTH, COLE and DAVIDSON, JJ.

*Victoria A. Salner, Assistant Public Defender,* with whom was *Alan H. Murrell, Public Defender,* on the brief, for appellant.

*Ray E. Stokes, Assistant Attorney General,* with whom was *Stephen H. Sachs, Attorney General,* on the brief, for appellee.

ORTH, J., delivered the opinion of the Court. ELDRIDGE, COLE and DAVIDSON, JJ., dissent. ELDRIDGE, J., filed a dissenting opinion at page 600 *infra,* in which COLE and DAVIDSON, JJ., concur.

Oliver Hudson claims that the acceptance of his pleas of guilty by the Criminal Court of Baltimore, Ross, J., presiding, to the assault of Charles E. Ireland, Jr. with intent to murder and to the attempted robbery with a deadly weapon of Charles Buemi, both on 29 November 1977, was ineffective. The pleas, made upon a plea bargain arrangement, were the culmination of judicial proceedings extending over some three days. The transcript of the record of the proceedings comprises 219 pages and reflects that Hudson enjoyed every advantage of our system for the administration of criminal justice which respects fully the rights of an accused. Although he bargained for the pleas and received what was agreed upon, he was not precluded under the present status of the law from appealing from the judgments entered thereon. He did so, and the Court of Special Appeals affirmed the judgments in an

unreported opinion. We granted certiorari on his petition which sought that we determine whether both his guilty pleas were "invalid, as being the result of coercion due to the denial to [him] of his rights to be represented by counsel and to be present at trial," and whether his plea of guilty to assault with intent to murder was "invalid as being entered without an acknowledgment of guilt and in non-conformance with *North Carolina v. Alford*," 400 U.S. 25, 91 S. Ct. 160 (1970). We hold that the pleas of guilty were validly entered by Hudson and effectively accepted by the court.

I

To establish the factual basis for the pleas, the State proffered evidence which would show the circumstances of the commission of the crimes. Buemi was the owner of what was basically a package liquor store. There were no stools or tables but customers could buy drinks by the glass at a counter which served as a bar. Between the entrance to the store and the counter was a partition about three feet "deep" which partially shielded the view of the counter from the front window. Ireland, a police officer, was a friend of Buemi. About 11:00 o'clock on the morning of 29 November 1977 Ireland, off duty and not in uniform, went to the store. Shortly thereafter, while Ireland and Buemi were talking at the counter, Hudson and another man entered. Hudson walked to the counter and his companion remained near the entrance door. Hudson ordered a beer. When Buemi turned to get it, Hudson took a handgun out of his pocket. Ireland said: "I'm a police officer." Hudson pointed the gun at Ireland and at pointblank range pulled the trigger, stepping back so as to be on the other side of the partition from Ireland. Ireland drew his service revolver and began firing. The first shot went through the front door; the second through the partition; the third shot hit Hudson on the left side of his head and injured his left eye. Buemi, although his back was turned, saw Hudson reflected in a big glass cooler in which the beer was kept. He observed Hudson pull the gun and point it at Ireland. He heard the hammer of the weapon "click at least twice." Hudson was placed under arrest and the gun was taken from him. It was fully loaded. When examined at the

Police Crime Laboratory it was discovered that the firing pin was missing.

Hudson was taken to the hospital in an ambulance. On the way, after there had been compliance with the requirements of *Miranda v. Arizona,* 348 U.S. 436, 86 S. Ct. 1602 (1966), Hudson told a police officer that he had been shot while he and one Frankie Johnson had "tried to hold up the bar" at Johnson's suggestion. They planned to take a No. 8 bus downtown after robbing the bar, then switch to a No. 5 bus and divide the loot. When a police lieutenant asked Hudson at the hospital what had happened, Hudson replied that he had already told the other officer.

Hudson stated that not all of the proffer accurately showed the facts. He did not deny the attempted armed robbery but he claimed that he was fully aware that the gun "didn't work." He declared:

> I have never used a pistol in any robbery that had bullets, shells, or was operable, you know, because when you go to stick up, or go to rob a place, if something was to go wrong, and you are not prepared for it, then you're likely to kill somebody, that entails murder, and that entails life imprisonment or the death penalty, see, unless you either prepare for such a situation, you'd be going in with the intention of getting life or getting away, but when you're just going in with the intent to rob this party — that's the way I was thinking. I plead guilty to the armed robbery, but to the attempted murder, I didn't have no — I was not going in there to murder anyone.

In answer to the court's inquiry about the gun being loaded, Hudson said that the bullets could be seen in the weapon — "it does add and instill fear." He also stated that "to the best of [his] knowledge," he did not tell an officer that he "went in to rob the store."

The court decided that there was a sufficient factual basis for the plea of guilty as to each offense, and this determination is not now challenged.

## II

The gamut of procedural niceties was run in reaching the ultimate acceptance of the pleas of guilty. When the case was called for trial on the morning of 11 September 1978, the assistant public defender, Alvin Sellman, Esq., informed the court that there was some question about the representation of Hudson: "[T]his was something I've been prepared to plea negotiate . . ., and this morning [Hudson] has had an about face, and he told me that he has an attorney named Robert Sherman that he paid a fee to, and he wants him to represent him. He also says he wants to ask for a postponement." After the luncheon recess, the case was again called. Hudson addressed the court. He requested a postponement to see if Sherman was going to represent him or until he could get a private attorney. He continued:

> "Now, as far as plea bargain is concerned, I'm not going to accept anything when somebody brings me and gives me — brings me the day that I'm supposed to appear in court and tells me that such and such is going to happen to me if I don't do so and so. Now, I don't care how black the situation looks or may appear to be, I know I have a right to come to court and face the people against me, you know, and have a trial by a jury if I so choose, and I don't want to be represented by the Public Defender because I don't believe he has my interests at heart, you know, and I want to get a little time so I can get myself together and get a private attorney where I could perhaps get some better advice, and if I do take a plea bargain it would be because I had sound judgment and not off the top of my head through fear or pressure."

In response to the court's observations that Hudson had been aware of the charges since 20 December 1977, Hudson said: "Not fully. The only thing I've had since December 27, 1977 is the charging document, which in my opinion, is contradictory and ambiguous to say the least." The court pointed out that when arraigned in June 1978 Hudson had

pleaded not guilty and prayed a jury trial. Sellman's appearance had been entered the same day. It appeared that Sherman did not represent Hudson. Hudson's family had been in touch with Sherman but had paid no fee. A fee was to have been paid from the proceeds of a workmen's compensation case Hudson's brother was pursuing. The case was later resolved, but according to Sherman: "I had learned Mr. Hudson desired the services of the Public Defender long before that matter was resolved. I never asked for any money, never received any on this case." Hudson claimed all that was news to him.

> I said before, I haven't received any formal statement of charges concerning indictment papers. I'm totally ignorant to exactly what evidence the State has against me. Besides that, the Public Defender informed me that it is the type case that, you know, it's to my benefit to accept the plea bargain. All I know about this case that I'm charged with, it could result in me possibly getting a hundred years. He said I don't have a chance to fight it, you know. I don't feel that is justice, that I'm being given a fair opportunity to defend myself. Even to plead guilty, I deserve some knowledge at least to base the guilty plea on. I don't think I should be called for today to be tried. . . .

Sellman observed that he had entered into plea negotiations because Hudson had been apprehended *flagrante delicto* — "[t]here is no defense to the case whatsoever." Hudson had not informed Sellman that he desired private counsel until that morning.

The court denied the request for a postponement, noting that Sellman was "a perfectly competent and qualified defense attorney," who, the court assured Hudson, would "do his usual good job of offering you whatever defense is appropriate and . . . will competently represent you in defense of the charges against you." Sellman suggested that he be

afforded the opportunity to discuss the matter further with Hudson. Hudson received permission to address the court:

I don't believe that Mr. "Spellman" can adequately represent me. I don't want, I don't desire him for my counsel; I don't desire anyone from the Public Defender's Office to represent me. You know, the postponement — the delay of the trial this far has all been for the State, you know. I could see it if I had been served any notice or anything came to me that informed me that I was due in court a certain date and what the charges were against me. At best, all I could work with was a charging document. If I'm going to be charged with the charging document, I'm sure I can bring adequate defense against that, you know, because that contradicts itself according to the charging document. Now, I'm going to be tried today on formal indictments, and you're telling me I should take Mr. "Spellman" because he's a good counsel, and he's already said my case is zipped, so if I don't take the plea bargain I'm through, if I do take it, in my mind, I'm equally through, because I'm giving up my right to a trial, I'm admitting guilt.

Regardless of how the circumstances look, I'm saying whatever time I get, I'm going to submit to that time without further — seeking legal redress of any means of getting back in society and I am not ready to accept that; I am not ready right now. I'm not saying that the deal offered to me by the State's Attorney is bad or anything; I'm saying I'm not ready to make any on-the-spot decision about a matter that could effect my life for the next thirty to fifty years; I am not ready for that.

The court stated that it would declare a recess so that Hudson and Sellman could confer. When court reconvened Sellman reported that although Hudson at first declared that he would not go on trial that day and would "not let the Public Defender represent him regardless," he had said "just a few seconds ago" that he would "accept the plea bargain as

offered to him by the State's Attorney's Office." Hudson stated that this was correct. He expressly affirmed that he was doing so willingly and voluntarily as in his best interests and with a full understanding of the plea bargain arrangement. Sellman placed the bargain on the record. Hudson was to plead guilty to robbery with a deadly weapon and to assault with intent to murder. The State would recommend a sentence of 20 years on the assault, and any sentence imposed on the robbery would run concurrently therewith. There would be no recommendation whether the sentences would run consecutive to or concurrent with a 10 year sentence for robbery Hudson was then serving. Hudson said that was his understanding.

Hudson was arraigned and pleaded guilty as agreed. The court examined him at length. It was elicited that Hudson was 23 years old and had completed a year of college, that he understood what a deadly weapon was and what constituted robbery and attempted robbery with a deadly weapon. Asked what assault with intent to murder was, Hudson answered: "That's when you assault somebody physically or threaten them to take their life and the completion of the assault would result in murder." He defined assault as "to do harm or threaten to do harm to someone." The court gave a more detailed explanation of the offense which Hudson said he understood. The court ascertained from Hudson that he had not imbibed any alcoholic beverages or taken any medication which would prevent him from thinking clearly and that there was nothing of which he was aware which would keep him from fully understanding what he was doing and talking about. Upon inquiry by the court, Hudson indicated that he knew that he was presumed to be innocent, which meant "that I am innocent until proven guilty or until I decide to plead guilty," that he had the right to plead not guilty and have his case tried by a jury or by the court, that he had the right to counsel of his choice when he went to trial, that under a not guilty plea the State would be required to confront him with witnesses testifying under oath and who would be subject to cross-examination, which Hudson defined as "[w]hen you question someone orally about a statement they're going to

make in court," that under a plea of not guilty he could testify in his own defense or elect not to testify with no adverse implication, that to be convicted his guilt would have to be proved by the State beyond a reasonable doubt and to a moral certainty, and that at a trial, he could call witnesses in his defense. The court questioned him further with respect to his right to have his guilt or innocence determined by a jury. Hudson said: "A jury consists of twelve people, who are impartial, and they hear the facts and they judge both sides of the case, and they render a verdict as to the guilt or innocence." He knew that the verdict of the jury had to be unanimous to convict. The court explained what was involved in a court trial, and they went fully into the import of a plea of guilty, specifying what rights were waived thereby. Hudson asserted:

> Yeah, I understand it. I realize the magnitude of what a guilty plea is. All I can say is that yes, I understand. Again, all of my decisions now are being made in the courtroom, they rest on the decision that you made today as far as not allowing me more time to get an attorney. With that in mind, you know, I plead guilty.

That statement provoked, of course, further discussion. The court gathered from what Hudson had just said and from what he had said earlier that he was upset about being called upon to make a decision on the spot with respect to pleading guilty or going to trial. Hudson agreed that this was so. The court requested Hudson to listen carefully to the question it was about to ask and to give the court "your honest answer, have you freely and voluntarily entered into this plea agreement with the State? Is it your free and voluntary decision to plead guilty today?" The transcript reads:

> THE DEFENDANT: Yes, that is my free and voluntary decision based on the knowledge that, you know, of what my —
> THE COURT: Alternatives?
> THE DEFENDANT: — alternatives was today.

THE COURT: In other words, you would have preferred to have the case postponed today, and you would prefer the opportunity to attempt to employ Mr. Sherman or some other attorney to represent you, but I denied your request, and you have been confronted with the decision of going to trial or pleading guilty, and what I want to be certain about that, in the circumstances, your decision to plead guilty is a free and voluntary one.

THE DEFENDANT: Yes, sir. That's what's left to me, and, as I say, it's free and voluntary.

THE COURT: Nobody has made any promises to you, other than the plea agreement to get you to plead guilty, have they? Have they?

THE DEFENDANT: Well, no promises but —

THE COURT: Has anybody made any threats against you, intimidated you?

THE DEFENDANT: No threats, no intimidation, but I've been pretty well convinced that this is — you know, the plea bargain is all I have; there's nothing else I can do but accept, I mean, to plead guilty. I'm not denying nothing as to the facts. I didn't want to go into denying the guilt of the matter; it was just certain charges I didn't feel I was guilty of that I wanted, you know, to get private counsel, you know. I was not fully knowledgeable to make a conscious decision to affect my life, though the decision I am making now is not based on intimidation or coercion, but it is based, to my knowledge, to my belief, on the fact that this is, you know, all, you know, the best way for me. You know, under the circumstances, there's no other choice in the matter. To go to court, it's almost a surety to be found guilty. It's been stated the facts show that I am guilty, and the guilty plea is my alternative.

Whereupon the court reviewed the plea agreement and explained that under it Hudson could be subject to serving 30 years if the court made sentences on the current offenses

run consecutively to the 10 year sentence Hudson was serving. An understanding was finally reached that Hudson could be sentenced to a total of 30 years less credit for the time actually served on the previous 10 year sentence.

The court returned once again to the pleas, asking: "You are pleading guilty because you are in fact, guilty of these charges?" Hudson replied: "I'm guilty of the . . . attempted armed robbery, and I'm pleading guilty to the attempted murder." This response prompted further inquiry as to why he was pleading guilty to assault with intent to murder and a reiteration by Hudson that he had no intention of murdering anybody and since the gun was inoperable he did not "have the ability to kill nobody with that weapon at all. . . ." Although he was not admitting guilt as to assault with intent to murder, he was pleading guilty to that crime "[b]ecause it's part of the deal."

Sellman initiated an extensive colloquy with Hudson about the adequacy of Sellman's representation, and thereafter, the State proffered evidence to show the factual basis for the pleas. Although the evidence as proffered was disputed in certain respects by Hudson, *see supra,* the court, as we have indicated, found that it established a sufficient factual basis and accepted the pleas.

Sellman was heard on the matter of disposition, and Hudson made a lengthy, most articulate statement in mitigation. Sentences were imposed — twenty years on the assault with intent to murder to run consecutively to the sentence presently being served; twenty years on the attempted armed robbery to run consecutively with the sentence presently being served but concurrently with the sentence on assault with intent to murder. This was completely in accord with the recommendation agreed upon in the plea bargain, but Hudson simply refused to accept that it was. Both court and defense counsel attempted to explain that he would be subject to incarceration for 20 years plus the balance of six years and a few months remaining to be served on the prior 10 year sentence. Hudson would not see it that way. He thought he should receive only one sentence, not separate sentences. He objected to the fact that the 20

year sentence would not begin until the time remaining on the prior sentence had been completed.

> Because then if I'm doing two separate sentences, then I have to finish the ten and then begin the twenty, which, in fact, means that I'm doing two different sentences, I mean two different time periods, and that means whatever time I would have got off on doing one, it would be like doubled, or would be extended. I might be able to get out and return to society in nine years, but this way it won't be possible. If I do nine years this way, it won't be possible.

He declared that his "understanding of the plea bargaining was for one sentence; it wasn't for two consecutive sentences, that's not what you told me." He was adamant in his rejection of two sentences — "I'm not going to accept two sentences." He insisted that the guilty pleas be stricken, and, after discussion, the court struck them. The next day being a holiday, the case was postponed for trial until 13 September.

When the case came on for trial on 13 September Hudson maintained his plea of not guilty but insisted that he did not want to be represented by Sellman. He desired assistance of counsel, but that counsel was not to be the assistant public defender. Protracted argument ensued. The court's view was that since Hudson had not indicated displeasure with Sellman until the morning the case first came on for trial, he was bound by his conduct in accepting Sellman as his attorney. Hudson's position was that he was entitled to a lawyer of his choice, and he did not choose Sellman. "He's already told me that I don't have a defense and that I'm guilty of the charge, so he can't possibly put up a defense for me. . . . He hasn't demonstrated to me any interest or ability." Nor would Hudson agree to represent himself; "I wish to have the assistance of counsel, but not Mr. Sellman." The court ruled: "If you want an attorney, Mr. Sellman is your attorney."

Hudson called the court's attention to a motion to dismiss the charges which he had filed in proper person on 12 June 1978 and refiled 18 August 1978. It went to the lack of a

preliminary hearing, failure to receive copies of the indictments, and denial of a speedy trial. Hudson demanded that an attorney argue them for him but would not agree that the attorney be Sellman. The court said that it would be glad to hear from either Hudson or Sellman as Hudson desired. Hudson argued at length, referring to the Maryland Rules of Procedure, federal cases, specific articles of the Maryland Constitution, and the federal speedy trial act. He was placed under oath and testified extensively on the motion. The State called a witness who was vigorously cross-examined by Hudson. Hudson made further argument on the motion, the State answered and Hudson closed. The court denied the motion, giving its reasons.

Hudson raised numerous other points which the court determined. Hudson asked if the two indictments would be tried together and when told that they would be, referred to Md. Rule 734 which he interpreted as calling for only one verdict and one sentence in such circumstance. The court straightened that out to his satisfaction. Hudson requested a brief recess before the jury was brought in.

After the recess, Sellman received permission to address the court. He said:

> Point No. 1 is this: I don't know if the plea bargaining would still be open to the defendant, or if he would accept the same, or if the Court would entertain it, but I asked him before a jury was sent for if he was still interested in the plea bargaining that was given to him, but he did not answer me one way or the other. The next thing I made known to the defendant during the recess was that if no plea bargaining was going to be had, that, according to the Court's ruling, the case is now ready to proceed to trial, and that a jury will be called. I told the defendant, so he won't antagonize the jury in any way, and that's why I'm bringing this out now, that if a jury is called because the Court has ruled as the Court has ruled, that I will be available to the defendant to handle the trial of the case, to cross examine, to make opening and closing statements, to make whatever objections are

582

necessary. I have explained to him if he doesn't want that then he shouldn't antagonize the jury and argue with me in front of them. I've also explained to the defendant if he chooses not to have me follow through as far as the handling of the procedure of the case, that I will be available, sitting next to him and he would have the same right to make opening and closing statements to the jury, to challenge the jury, to cross examine witnesses, to make objections, and I told him if there are any questions about procedure that he was not certain of that I would be available for him to confer with me, if there were any questions of tactics that he would like to confer with me about I would be available to him, and I would also give him the benefit of the voir dire that I prepared on his behalf and do anything that I can to assist him in the event he elected to take over the control and the handling of the case himself. So, as I say, I would like the record to reflect that.

Hudson flatly denied that Sellman had discussed anything with him except the plea bargain. Hudson then asked that the court hear from a witness concerning the employment of Sherman. Eloise Laws was sworn. She said Sherman had been paid $900 in three installments, the last in May or July, to represent Hudson. She claimed that receipts were given but she did not have them with her. The court observed: "This is new evidence which contradicts what Mr. Sherman told us. The documentation has not been submitted, and Mr. Sherman has not been confronted with this testimony and, therefore, has not had an opportunity to respond to it. That may be a matter for another day in another proceeding, but it has no effect on the decisions which have been made by this court as to the defendant's failure to make any statements to the Criminal Court of Baltimore with respect to representation other than by the Public Defender, Mr. Sellman, [Sellman's appearance had been entered on 9 June 1978] and when he does so on the day of trial it becomes too late."

Sellman went on the record again:

> Well, the judge apparently is going to send for the jury now, and I would be willing to represent you to the best of my ability when the jury trial is had, so I will ask you now, out of the presence of the jury, do you want me to handle the trial of the case or just what you would like to do, Mr. Hudson. Are you interested in plea bargaining if it would still be open, if the Court would accept it? Now, I will say for the record, if it is still open, and if the Court is still willing to entertain it, that I feel from my full understanding of the case, and I am completely aware of what the case is all about, that it would be to your best advantage, with the full knowledge of everything that has occurred, full knowledge of your past record and so forth, for you to accept the plea bargain. That's advice; it's not a mandate on my part, I'm not trying to intimidate you. I am just as counsel trying to advise you what I feel is to your best interest.

Hudson asked and received permission to address the court and responded thus: "Once more, Your Honor, the Public Defender has recommended his usual recommendation of me pleading guilty, which I rejected as many times as I can recall in this courtroom."

Hudson did not abandon his resistance to proceeding with the trial. He sought a delay to obtain medication, "to give me some time for me to see a doctor and perhaps I can get some of this pressure off of my mind, alleviate this pain in my head, because right now it's getting difficult for me to think and to make clear decisions." He felt "affected" by the pain medication he had been given. The court recessed with instruction to have Hudson examined by a doctor. When the court reconvened about two hours later it received the report of the examination which had been made by a medical officer of the Supreme Bench of Baltimore City. The medical officer had also discussed the matter with an ophthalmologist at Johns Hopkins Hospital who had treated Hudson. The

conclusion was that "Hudson presents no symptomatology that would present any real reason for him not being able to participate in his trial today." In short, there was "no medical reason ... to delay this trial in any way, shape or form."

The State gave the court voir dire questions it requested. Sellman said: "[A]gain, if my client wishes me to handle the procedures at the trial I will. I do have voir dire, and he is welcome to use them if he wishes to handle the trial himself." The defense's requests were handed to the court. Hudson would not agree to allow Sellman to participate in the trial nor would he elect to represent himself. "I do not want Mr. 'Spellman' to represent me in any shape, fashion or form in this courtroom. . . . I am not electing to proceed to try my own case." He expressly objected to Sellman sitting at counsel table with him so as to be available for consultation. "I would like a lawyer I can trust, a lawyer I can depend on." The transcript reads:

> THE COURT: The only lawyer you're going to have in the trial of this case is Mr. Sellman.
>
> THE DEFENDANT: That's Your Honor's decision, I can't speak for that.
>
> THE COURT: Let's not waste time talking about anything else. I'm going to right now, unless you request differently, ask Mr. Sellman to take a seat in the audience and to remain here during the course of the trial and be available in the event the Court should want him to do something or you should want him to do something, but you have told me you do not want him to participate in any way, and you do not want him to sit at counsel table. That's what I'm going to do unless you ask me to do something differently.
>
> THE DEFENDANT: Your Honor can do that. Also I am not electing to represent myself. I want to make that clear.

The court requested Sellman to "take your papers and take a seat in the audience, remain here throughout the trial on the contingency that your services will be needed later on."

Sellman indicated that he was "glad to do so," and added:

> I will say for the last time that I understand his decision, but I want the record to reflect I am fully prepared to represent his interests and give him everything within my professional ability to do what I can to represent him on his behalf.

Hudson tried once again to stymie the trial:

> I will state to the Court I am experiencing severe pains, and I don't feel competent at this time to select a jury. I've been given an Empirin, a pill which, to my knowledge, will not alleviate the pain at this present time. I feel the same way I did before the recess, and for me to work alone and to pick a jury under these circumstances I feel is far too difficult for me right now.

The court gave Hudson a lucid explanation of the procedures in selecting the jury and trying the case. When asked if he had any questions, Hudson made no response.

The jury panel was brought in and examined by the court on their voir dire. The court again explained to Hudson his rights regarding challenges, which Hudson professed not to "fully understand." Having "now been told by the court that [he] represented [himself]," he requested postponement and wanted to appeal from the denial of that request. The selection of the jury continued. Hudson moved to strike for cause a woman juror who had once been mugged but who stated that her experience would not keep her from giving a fair and impartial verdict. Hudson gave as grounds that "[s]he'd be prejudiced toward me from her experience. I think the experience she had would have an impact on her." The court reserved its ruling. At the conclusion of the voir dire the court struck the juror. At a bench conference Hudson resumed his demands for a postponement, and for a lawyer other than Sellman. He also insisted that he be allowed to question the jurors personally. It developed, however, that the questions he desired to propound had in the main been covered by the judge's voir dire. After prolonged argument,

the bench conference terminated and the selection of the jury continued. Hudson was granted another bench conference. He "object[ed] to the State's selecting twelve jurors," complained anew about the entire conduct of the trial, vilified Sellman and protested further the denial of a lawyer of his choice. He made a motion that the trial judge disqualify himself:

> I ask Your Honor to disqualify himself because I think Your Honor is prejudiced against me and biased in this case because of the things that have transpired in this case, because of my failure to accept counsel Your Honor has appointed me, and because I was tricked into or misled by my attorney into believing one thing about the plea bargain and forced to give up — the statement that I was told that there were mitigating circumstances to my guilty plea, and, as Your Honor heard what the Court has reported as my admissions to the crime, therefore, I don't believe Your Honor can be impartial to the facts that are going to be presented before the Court.

Judge Ross explained that he was not going to decide any facts, that was for the jury. There was no question in his mind, he declared, that he could "preside fairly and impartially at this trial." Hudson was not placated:

> I have been ordered by the Court to represent myself, I am being forced to go ahead without counsel, and so I said to myself, there won't be anything to voir dire. I can't see any information about my case, I can't receive a recess, postponement, anything of that nature, so would Your Honor disqualify himself so I could go before another court, another judge who would not be prejudiced and would possibly allow me to postpone the case until I'd be able to obtain private counsel?

The court denied the motion. Hudson resumed the refrain: "I don't want Mr. Sellman; I don't want to represent myself."

The court ordered him to return to the counsel table and the bench conference terminated.

The selection of the jury continued. A juror was declared to be acceptable to the State. When the clerk asked if she was acceptable to the defendant, Hudson made no response. The clerk directed that the juror take a seat in the jury box. The transcript reads:

> THE DEFENDANT: Your Honor, I object to the State's Attorney putting another juror in the jury box without me having any opportunity —
>
> THE COURT: Mr. Hudson, I have explained to you the procedures that are followed in the courtroom.
>
> THE DEFENDANT: But you told me I don't have no choice but to let her select the jury.
>
> THE COURT: Mr. Hudson, may I see you at the bench, and, Mr. Sellman, would you come forward, please, and Miss Bruning [the Assistant State's Attorney]?
>
> (BENCH CONFERENCE)
>
> THE COURT: I have explained to you before, Mr. Hudson, that you may not stand up at counsel table and make any statements.
>
> THE DEFENDANT: I was —
>
> THE COURT: Listen to me! You are now impeding, without any sound basis at all, the progress of this case. You will conduct yourself in accordance with the rules which I have laid down for this procedure or you will be removed from the courtroom and you will remain outside of the courtroom, and we will proceed to the trial with you outside. You are not going to interfere with the trial of this case nor further impede its progress. I have asked Mr. Sellman to come forward and be present so he could hear this, but that is it, you are not going to interrupt this case, you are not going to prevent this case from being tried in accordance with the normal rules of the normal procedures. Now, I am asking you now to return to the counsel table, take

your seat. You have the right to challenge each individual juror. I am going to, as soon as you get back to your seat, ask the two additional voir dire questions you requested me to ask. If you do not conduct yourself in the manner which I have indicated, then I am going to direct the Guard to take you back down to the lock up, and you will remain in the lock up and we will proceed with the selection of the jury, and tomorrow morning with the trial of this case, and I will send word down to you periodically to ask if you wish to return, but you will be permitted to return only after you have assured me that you will conduct yourself in accordance with the rules of court and in accordance with my instructions to you. Now, do you understand what I have said?

THE DEFENDANT: Are you telling me that you can now have my trial without me being present?

THE COURT: If you do not behave yourself as you are required by the rules of court and by the instructions of the judge, that's exactly what I'm telling you.

THE DEFENDANT: Your Honor, I don't mean to misbehave in court, but I feel that I have not been given a chance to do anything.

THE COURT: I understand how you feel, Mr. Hudson, and I'm not going to listen anymore to how you feel.

THE DEFENDANT: Are you —

THE COURT: I'm telling you what's going to happen.

THE DEFENDANT: You ask me to sit there and let the State's Attorney pick twelve jurors.

THE COURT: Mr. Hudson, if, when I finish this sentence, you don't go back to that chair and sit down, conduct yourself as I have instructed, I'm going to direct the Guard to remove you from the courtroom and that will be it. Do you understand?

No further comment, no further word, just go back or you will be removed.

THE DEFENDANT: Your Honor, one more question. If I am removed, Mr. "Spellman" takes over my case?

THE COURT: If you want him to.

THE DEFENDANT: I don't want Mr. "Spellman" to do anything for me. I would like to have my own lawyer in here to represent me.

THE COURT: You may go back to your chair or you may leave the courtroom.

THE DEFENDANT: I don't want to leave the courtroom, Your Honor.

THE COURT: Then go back to your chair. Go back to your chair and sit down.

THE DEFENDANT: Can I object to this.

THE COURT: You have objected.

THE DEFENDANT: I would like to object to all of the jurors because I haven't chosen anyone, and the State has chosen everyone. I don't think I'll be given a fair trial by the twelve jurors.

THE COURT: Officer, take him down to the lock up, please, and until I receive word from you that you're going to conduct yourself in accordance with the rules of this court and my instructions, you will remain out of the courtroom.

THE DEFENDANT: You're going to remove me and the State is going to pick twelve jurors?

THE COURT: Remove him, Officer.

THE DEFENDANT: Could I ask a question?

THE COURT: No.

THE DEFENDANT: Is Mr. "Spellman" going to represent me?

THE COURT: No.

(BENCH CONFERENCE TERMINATED)

THE DEFENDANT: Could I ask Your Honor a question?

THE COURT: No. You may take your seat or you may leave.

THE DEFENDANT: I would like to stay in the courtroom, but I want an opportunity —

THE COURT: Officer, remove him.

THE DEFENDANT: I'd like an opportunity to question the jurors.

THE COURT: Now, Officer.

(Thereupon, the defendant was removed from the courtroom.)

The court explained to the jury why Hudson had been removed and asked if there were any juror who would be unable to render a fair and impartial verdict because of what had occurred during the jury selection process. Three of the jurors answered in the affirmative and were excused. The court then asked two more voir dire questions which had been requested by Hudson. At the bench the Assistant State's Attorney requested that the court ask if any member of the panel would be unable to render a fair and impartial verdict in the event the defendant did not return to the courtroom. Eight members of the panel answered in the affirmative and were excused. The jury was selected and sworn. Due to the lateness of the hour, the jury was excused to return the next day.

The next morning, Hudson was brought before the court. Judge Ross recounted in detail what had occurred during the two days the case had been before him and went over again the grounds for his various rulings. Noticing that the docket entries did not show compliance with Md. Rule 723, dealing with provision for or waiver of counsel, he proceeded to fulfill the requirements of that rule. In so doing, he pointed out that sentences totaling 80 years could be imposed upon convictions under the two indictments, and that those sentences could be made to run in addition to the balance remaining on the sentence Hudson was presently serving, in all, in excess of 86 years. Hudson asked if he could speak with Sellman, and the request was granted. After an off-the-record conference between Hudson and Sellman, Sellman reported that Hudson,

upon learning that he would be subject to a maximum term of over 80 years, had indicated that "subject to his speaking to his ... grandfather ... he would be most likely interested in reinstating his guilty plea[s]" pursuant to the plea bargain previously agreed upon. This was agreeable to the State provided that there was a clear understanding of the bargain. The Assistant State's Attorney then reiterated the terms of the bargain. Whereupon Sellman repeated it to Hudson:

> In other words, I will repeat it to make sure, she is going to offer you a sentence of twenty-six and a half years, subject to the Court's accepting it, the plea bargain, on the assault with intent to murder charge, the attempted robbery deadly weapon charge the sentence offered you is twenty years, but that twenty years would run concurrent with the twenty-six and a half year sentence, that means they run together, it is just one sentence, and those two sentences which would run concurrent would also run concurrent with the sentence you are now serving, so that your maximum time for incarceration, if the judge gave you the maximum, would be twenty-six and a half years.

Hudson expressly asserted that he understood that was the plea bargain. At his request, his grandfather joined him at the trial table, and there was an off record conference between them, after which Sellman asked Hudson if he had come to a decision after speaking with his grandfather. Hudson replied:

> Yes, sir. If Your Honor would accept the plea bargain by the State, I am fully aware of what the maximum penalty is, and if the State will accept my guilty plea, I will reinstate it.

The court took over.

> THE COURT: With the modification in the sentence recited by Mr. Sellman and Miss Bruning, is that correct?
>
> THE DEFENDANT: Yes, sir.

THE COURT: We went through on Monday afternoon —

THE DEFENDANT: Yes, sir.

THE COURT: — a lengthy discussion of the nature of the charges against you and the consequences of your plea of guilty. If you will recall, after I finished discussing with you all of the rights that you have with respect to determination of your guilt or innocence, I said that by pleading guilty you give up all of those rights, and I also said to you that you give up all of your defenses. Now, when you plead guilty today everything I said to you Monday still applies, and it means that you are giving up every defense that you have and every right to review on appeal the things this Court has done since then, do you understand that?

THE DEFENDANT: Yes, sir.

THE COURT: I just talked to you earlier by saying everything that I have done is subject to review after the final judgment and sentence, but when you plead guilty it wipes all of that out, you are giving up all of that; you won't have the right to review on appeal any of these rulings that you seem to disagree with that I did yesterday and that I did on Monday. Do you understand that?

THE DEFENDANT: Yes, sir.

THE COURT: We discussed very lengthily the rights you have to appeal from a guilty plea, jurisdiction of the Court, competence of counsel and that sort of thing. Do you understand?

THE DEFENDANT: Yes, sir.

THE COURT: So the point is when I impose a sentence, for all practical purposes that is final, no other court is going to change that with any degree of likelihood. Do you understand that?

THE DEFENDANT: Yes, sir.

THE COURT: And you have waived and given up all of your defenses and all of the rights you would

have with respect to determination of guilt or innocence, there is nothing to appeal from. You will have a right to seek review of the sentence by a panel of three judges, but my experience has been it's very seldom that review panel changes the sentence imposed by the trial judge. So, for all practical purposes, my sentence for your plea of guilty and the entry of the sentence is final. You understand that?

THE DEFENDANT: Yes, sir.

THE COURT: You remember all of the things we discussed on Monday?

THE DEFENDANT: Yes, sir.

THE COURT: Do you have any question at all to ask me at this time with respect to the nature of the charges against you or the consequences of your guilty plea?

THE DEFENDANT: No, sir.

THE COURT: And you are freely and voluntarily today entering that guilty plea?

THE DEFENDANT: Yes, sir.

THE COURT: No one has made any promises to you other than the new plea agreement?

THE DEFENDANT: No, sir.

THE COURT: No threats?

THE DEFENDANT: No threats.

THE COURT: No force was brought to bear upon you?

THE DEFENDANT: No, sir.

THE COURT: It is your free and voluntary decision?

THE DEFENDANT: Yes, sir.

Sellman made further inquiry.

MR. SELLMAN: Mr. Hudson, since you left the courtroom yesterday, other than any Empirin which was given to you, have you had any alcohol, or other

medications, or drugs which would in any way affect your ability to understand what Judge Ross and I are now explaining to you?

THE DEFENDANT: Not to my knowledge. No alcohol. I have had some medicine, but nothing that would affect my understanding.

MR. SELLMAN: One other question. Despite the problems that occurred yesterday about counsel and so forth, I will ask you now, because of our latest discussions, especially about your willingness to enter into these new plea negotiations, do you feel that I have represented you and given you full conscientious and capable representation to the best of my ability, tried to act in your best interests, and tried to answer all of your questions for you?

THE DEFENDANT: I think you have given me the same — you have given me a better deal than you gave me Monday.

MR. SELLMAN: I mean is there anything now about my services that you want to complain about before we proceed with the plea negotiations? If there are, I would rather you speak up now.

THE DEFENDANT: I don't understand that.

MR. SELLMAN: Is there any complaints you had about my services? As I say, I am trying to conscientiously do what I can to help you on your behalf, to have this to work out to your satisfaction. I have done the best I could, and I want to know if you have any complaints about my services before the Court finally disposes of your case.

THE DEFENDANT: The only complaints I had the judge ruled on, so I've already pled guilty, and everything the judge ruled on, I guess I am waiving that now.

MR. SELLMAN: Yes, he just explained that to you.

THE DEFENDANT: So I don't have no complaints.

MR. SELLMAN: But are you satisfied with my services as to these latest plea negotiations?

THE DEFENDANT: Oh, yes, I'm satisfied with the plea bargain.

Hudson asserted that he had nothing to say before sentence was imposed. Sellman spoke in mitigation. The court announced the sentence. With respect to the crime of assault with intent to murder, the sentence was twenty-six years, six months imprisonment "to date from today's date, which means that it will run concurrently with the balance of the sentence which the defendant is presently serving." With respect to the crime of attempted robbery with a dangerous and deadly weapon, the sentence was twenty years imprisonment, "which will run concurrently with the sentence previously imposed.

Sellman informed Hudson of his rights to appeal and to a review of sentence, and the case was finally concluded. The jury was brought back out and excused.

### III

The standard for determining the validity of a guilty plea is "whether the plea represents a voluntary and intelligent choice among the alternative courses of action open to the defendant." *Alford,* 400 U.S. at 31. *See Boykin v. Alabama,* 395 U.S. 238, 242, 89 S.Ct. 1709 (1969); *Machibroda v. United States,* 368 U.S. 487, 493, 82 S.Ct. 510 (1962); *Kercheval v. United States,* 274 U.S. 220, 223, 47 S.Ct. 582 (1927). This standard is met when the plea was entered by an accused:

(1) voluntarily, that is, not through coercion, terror, inducements or threats, subtle or blatant; and

(2) with an intelligent understanding, that is, not through ignorance or incomprehension:

    (a) of the nature of the offense to which he is pleading guilty; and

    (b) of the possible consequences of such a plea; and

(3) unconditionally, that is, without any condition or qualification;

> (4) even though the accused denies his guilt, provided the prosecution demonstrates a strong factual basis for the plea and the accused clearly expresses a desire to enter it despite his professed belief in his innocence.

*See Davis v. State,* 278 Md. 103, 108-118, 361 A.2d 113 (1976); *Williams v. State,* 10 Md. App. 570, 571-574, 271 A.2d 777 (1970), *cert. denied,* 261 Md. 730 (1971); *McCall v. State,* 9 Md. App. 191, 194-201, 263 A.2d 19, *cert. denied,* 258 Md. 729 (1970). The determination in a particular case whether the standard was met depends upon the particular facts and circumstances of that case, including the background, experience, and conduct of the accused. *See Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019 (1938). The same principles must be applied to determine whether a guilty plea is voluntarily and intelligently made as are applicable in the determination of the waiver of a federal constitutional right, since "[s]everal federal constitutional rights are involved in a waiver that takes place when a plea of guilty is entered in a state criminal trial," and "[t]he question of an effective waiver of a federal constitutional right in a proceeding is of course governed by federal standards." *Boykin* at 243. *See Curtis v. State,* 284 Md. 132, 142-144, 395 A.2d 464 (1978). The record must affirmatively show that the standard was met; the waiver of a federal constitutional right cannot be presumed from a silent record.[1] *Boykin* at 242. *See* Md. Rules 731 and 733.

When viewed in light of the entire record here, the validity of the guilty pleas entered by Hudson cannot be seriously questioned. The record not only fully discloses the facts and circumstances surrounding their entry but is also most revealing as to Hudson's background, experience and

---

1. When the trial court properly performs its function of canvassing the matter of a plea of guilty with the accused on the record to make sure that the accused has a full understanding of what the plea connotes and of its consequence, it leaves a record adequate for any review that may be later sought, and forestalls the spin-off of collateral proceedings that seek to probe murky memories. Boykin v. Alabama, 395 U.S. 238, 243-244, 89 S.Ct. 1709 (1969).

conduct. His active personal participation in the court proceedings over a period of three days put his strengths and weaknesses in sharp focus. It showed him to be a man of strong will, not easily overborne. He has firm convictions and is steadfast in adhering to them to the point of obstinacy. He is very articulate and is able, and by no means reluctant, to express his opinions and beliefs. He is aggressive in asserting what he feels are his rights and is resistant to, rather than cowed by, authority. His formal education is by no means meager; it includes a year of college. He amply demonstrated, however, that he is knowledgeable beyond his schooling, especially in the criminal law as it relates to his own unlawful activities. Apparent from his comments and actions is that he is neither naive nor artless, and his approach to the matter was marked by ingenuity, not ingenuousness. His arguments indicated that he is astute, shrewdly discerning and sagacious, not adverse to manipulating facts and maneuvering situations to serve his particular purpose, changing his position accordingly.

The inescapable conclusion from examination of the record is that Hudson did not plead guilty through ignorance or incomprehension of the nature of the offenses and the possible consequences of the pleas. He had an intelligent understanding of the crimes of robbery with a deadly weapon and of assault with intent to murder and was aware of the punishment that could be imposed upon conviction of each of those offenses.

The pleas were without any condition or qualification. *See Roberts v. Warden,* 221 Md. 576, 580, 155 A.2d 891 (1959). *Compare Wayne v. State,* 4 Md. App. 424, 429-430, 243 A.2d 19 (1968). Once Hudson and the State had reached agreement on the bargain, there was neither condition nor qualification with respect to their entry. Hudson knew that the court did not have to accept either the pleas or the recommendation as to sentences to be made by the State under the plea bargain arrangement.

The pleas were voluntary. The circumstances under which they were entered and Hudson's actions and comments belie that they were in any way "the result of coercion due to the

denial to [him] of his rights to be represented by counsel and to be present at trial." The record does not support the view that his ultimate decision to plead guilty was due to denial of the assistance of counsel.[2] Nor does the record support the claim that the pleas were compelled by Hudson's unwilling absence from the courtroom during the selection of some members of the unused jury.[3] The record plainly shows that Hudson pleaded guilty in order to receive lighter punishment. In short, he weighed twenty-six years six months against some eighty years and opted for the procedure which he had every reason to believe would result in the lesser term. The choice was not the product of coercion, terror, inducements, or subtle or blatant threats. That it was other than voluntary was expressly denied personally by Hudson upon persistent inquiry by the court before accepting the pleas. The plea bargain arrangement was not such an inducement as to make the pleas invalid, and the possibility of a heavier sentence did not constitute a threat which made them constitutionally infirm. "That he would not have pleaded except for the opportunity to limit the possible penalty does not necessarily demonstrate that the plea of guilty was not the product of a free and rational choice, especially where the defendant was represented by competent counsel whose advice was that the plea would be to the defendant's advantage." *Alford,* 400 U.S. at 31. We conclude that the record here affirmatively shows that Hudson's pleas of guilty represented a voluntary and intelligent choice among the alternative courses of action open to him.

Hudson's contention that his plea of guilty to the offense of assault with intent to murder was invalid "as being entered without an acknowledgment of guilt and in non-conformance with *North Carolina v. Alford,*" is without merit. "[W]hile

---

2. Counsel of record, always available to Hudson, competently attempted to serve his client's best interests by negotiating a plea bargain and advising Hudson to accept it. In light of the evidence the State could adduce, counsel's recommendations did not appear to be ill-advised. In any event, Hudson availed himself of the representation of counsel during the entry of the pleas leading to the judgments against him.

3. Hudson does not now suggest that the judge's action in having him removed from the courtroom was improper in the circumstances. *See* Illinois v. Allen, 397 U.S. 337, 90 S.Ct. 1057 (1969); Md. Rule 724 c 2.

most pleas of guilty consist of both a waiver of trial and an express admission of guilt, the latter element is not a constitutional requisite to the imposition of criminal penalty." *Alford,* 400 U.S. at 37. The teaching of *Alford* is clear:

> An individual accused of crime may voluntarily, knowingly, and understandingly consent to the imposition of a prison sentence even if he is unwilling or unable to admit his participation in the acts constituting the crime. [*Id.*]

During the tendering of the guilty pleas which were later stricken, Hudson refused to admit that he intended to murder the officer and stated that he was pleading guilty to that crime "[b]ecause it's part of the deal." Upon entering the pleas the second time, however, he made no denial of his guilt of the offense and it may be that he abandoned his denial of guilt as to that crime. In any event, assuming that the ultimate entry of the plea, which we have determined to have been otherwise voluntarily and intelligently made, was upon an unwillingness to admit guilt of assault with intent to murder, in view of the strong factual basis for the plea demonstrated by the State [4] and Hudson's clearly expressed desire to enter it despite his professed belief in his innocence, we think that it was squarely within the teaching of *Alford* and was acceptable under its principles.

We hold that the Criminal Court of Baltimore did not commit error in accepting Hudson's pleas of guilty.

*Judgment affirmed; costs to be paid by appellant.*

---

[4] The trier of fact would not have to believe that Hudson knew the gun he used in the robbery and assault was not operable because the firing pin was missing. It was fully loaded, and there was evidence that he pointed it at the officer and, at point blank range, pulled the trigger at least once and perhaps more.

*Eldridge, J., dissenting:*

The State, at oral argument in this Court, conceded that Hudson had been denied his constitutional right to the assistance of counsel at trial and that, but for Hudson's ensuing guilty plea, this case would have to be reversed. The State, however, takes the position that Hudson's subsequent guilty plea was voluntary and thus cured the denial of his right to counsel. In my view, this is simply incorrect. In light of all the events that transpired in this case, the second guilty plea was the antithesis of "a voluntary and intelligent choice among the alternative courses of action open to the defendant." *North Carolina v. Alford,* 400 U.S. 25, 31, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970). Instead, the guilty plea was the product of the prior violations of Hudson's rights and the chain of events resulting therefrom.

The "alternative course of action" referred to by the Supreme Court in *Alford* is the choice between a full trial, with adequate representation by counsel, at which all defenses may be raised, or the alternative of a guilty plea forgoing trial. In the instant case, however, the trial court virtually forced Hudson unwillingly to represent himself — a task for which the subsequent events amply demonstrate that he was incompetent. Once placed in this predicament, Hudson did not have any prospect of a trial at which his interests could be either adequately represented or asserted. Consequently, it cannot be said that Hudson had any rational choice among viable alternatives. As Hudson himself repeatedly indicated, he had no option but to secure the most advantageous plea bargain that could be arranged.

It is clear that Hudson did not believe that he had a defense to the charge of attempted robbery with a deadly weapon. He readily admitted his guilt and expressed no objection to serving a sentence on this charge. It is equally clear, however, that Hudson believed that he had a valid defense to the charge of assault with intent to murder, and he repeatedly denied any guilt on this charge. As was confirmed by the police crime lab, the gun Hudson used in the robbery attempt did not have a firing pin and was, therefore, inoperable. Hudson stated that

he knew that the gun would not operate because he had actually attempted to fire the weapon prior to the robbery attempt in order to be certain that it would not work. Moreover, as Hudson stated, he had

> "never used a pistol in any robbery that had bullets, shells, or was operable, you know, because when you go to stick up, or go to rob a place, if something was to go wrong, and you are not prepared for it, then you're likely to kill somebody, that entails murder, and that entails life imprisonment or the death penalty, see, unless you either prepare for such a situation, you'd be going in with the intention of getting life or getting away, but when you're just going in with the intent to rob this party — that's the way I was thinking. I plead guilty to the armed robbery, but to the attempted murder, I didn't have no — I was not going in there to murder anyone."

If the jury accepted Hudson's statement that he knew the gun to be inoperable, he would have had a valid defense to this charge. Although, as the majority states, the jury might have refused to believe that Hudson was aware of the gun's condition, it is equally true that the jury might have believed him. Normally, an individual owning a handgun knows whether or not it has a firing pin.

Hudson, however, was frustrated in his every attempt to assert this defense. Hudson had attempted to retain a Mr. Sherman to represent him and had understood from Mr. Sherman that he did have a valid defense. Although Hudson alleged that his family had made some payments toward Mr. Sherman's fee, Hudson learned on the day of trial that the full fee had not been paid and that Sherman would not be representing him. Accordingly, he requested a postponement of the trial in order to arrange for Mr. Sherman to represent him or to arrange for a different private attorney.

Mr. Sellman, a public defender, had been assigned to represent Hudson. Sellman, however, did little, if anything, to assist Hudson in asserting his defense. Up until the day of trial, Hudson had only had a brief, initial interview with

Sellman's law clerk, and had never met or discussed his case with Sellman. The defendant was first informed on the day of trial of the substance of the plea bargain that Sellman had arranged. Although Hudson repeatedly insisted that he wanted to defend against the charge of assault with intent to murder, Sellman simply stated that "there was no valid defense." The record does not reveal any instance in which Sellman ever discussed the possible merits of this defense; nevertheless, the record does indicate at least six times in which Sellman urged that Hudson accept the plea bargain. Faced with Sellman's repeated advice to plead guilty, and his disinterest in the defense which Hudson wanted to assert, Hudson not unreasonably expressed his dissatisfaction with Sellman and continued his attempts to get a different attorney. As Hudson stated at the motion for postponement:

> ". . . I would like to request that the Court grant a postponement until I can either see if Mr. Sherman is going to represent me or until I can secure a private attorney. I have been worried about my family trying to get some funds, and we have accumulated a little bit of money, and I believe if I am given a little bit of time we can get the necessary funds to obtain private counsel.

> "Now, as far as plea bargain is concerned, I'm not going to accept anything when somebody brings me and gives me — brings me the day that I'm supposed to appear in court and tells me that such and such is going to happen to me if I don't do so and so. Now, I don't care how black the situation looks or may appear to be, I know I have a right to come to court and face the people against me, you know, and have a trial by a jury if I so choose, and I *don't want to be represented by the Public Defender because I don't believe he has my interests at heart,* you know, and I want to get a little time so I can get myself together and get a private attorney *where I could perhaps get some better advice,* and if I do take a plea bargain it would be because I had sound

judgment and not off the top of my head through
fear or pressure." (Emphasis supplied.)

Thus, Hudson had a legitimate desire to get a different
attorney. His dissatisfaction with Sellman simply was not
expressed in an attempt to get a delay of the case. Rather,
it was based on Sellman's disinterest in asserting the one real
defense that Hudson believed that he had.

When, after the trial court denied Hudson's motion for a
postponement, Hudson continued to express his
dissatisfaction with Sellman's lack of interest in asserting his
defense, the trial court effectively placed Hudson in an
absolute bind. Hudson simply wanted an attorney who was
willing to raise his defense to the charge of assault with intent
to murder. The trial court, however, in effect ordered Hudson
either to take Sellman as his attorney, who repeatedly wanted
Hudson to plead guilty and drop his defense, or to represent
himself. Hudson expressed this when he told the trial court:

"... Now, I'm going to be tried today on formal
indictments, and you're telling me I should take Mr.
'Spellman' because he's a good counsel, and he's
already said my case is zipped, so if I don't take the
plea bargain I'm through, if I do take it, in my mind,
I'm equally through, because I'm giving up my right
to a trial, I'm admitting guilt.

"Regardless of how the circumstances look, I'm
saying whatever time I get, I'm going to submit
to that time without further — seeking legal redress
of any means of getting back in society and I am not
ready to accept that; I am not ready right now. I'm
not saying that the deal offered to me by the State's
Attorney is bad or anything; I'm saying I'm not
ready to make any on-the-spot decision about a
matter that could affect my life for the next thirty
to fifty years; I am not ready for that."

Faced with this prospect, Hudson decided to accept the plea
bargain. He continued, however, to assert his innocence to the
charge of assault with intent to murder, stating that he only

pleaded guilty to that charge because "it's part of the deal," and because

> "*there's nothing else I can do but accept*, I mean, to plead guilty. I'm not denying nothing as to the facts. I didn't want to go into denying the guilt of the matter; it was just *certain charges I didn't feel I was guilty of that I wanted, you know, to get private counsel,* you know." (Emphasis supplied.)

After this plea was withdrawn, Hudson continued his attempts to secure a satisfactory attorney. Although he reiterated his dissatisfaction with Sellman, he repeatedly expressed that he desired another attorney and that he was not electing to represent himself. The mere expression of his dissatisfaction with Sellman and his desire for a different attorney clearly did not meet the standard for an election of self-representation set forth in *Faretta v. California,* 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975), or a waiver of his right to counsel. *Snead v. State,* 286 Md. 122, 406 A.2d 98 (1979); *State v. Renshaw,* 276 Md. 259, 347 A.2d 219 (1975). Nevertheless, the trial court virtually forced Hudson to represent himself by telling him that, by objecting to Sellman, he had in effect chosen to do so. Thus, despite the absence of a waiver of counsel, the court permitted Hudson to represent himself in the argument of pretrial motions and during the voir dire examination and impanelling of the jury, rather than ordering Sellman to continue to represent Hudson. In so doing, the trial court clearly denied Hudson his right to the assistance of counsel. *State v. Renshaw, supra. See State v. Bryan,* 284 Md. 152, 395 A.2d 475 (1978); *Thompson v. State,* 284 Md. 113, 394 A.2d 1190 (1978).

Hudson's repeated expressions of his inability to represent himself are amply supported by the results of his effort. He was frustrated in each and every turn he took. His requests for a postponement in order to prepare to defend himself and to review the evidence were denied. His argument on his motion asserting that he had been denied a speedy trial was rejected. During voir dire, the trial court unsuccessfully

attempted to explain the procedure to Hudson. The following colloquy took place:

"Now, while you are here, Mr. Hudson, you have the right with respect to any member of the panel, including those who respond yes to any of these questions, to move to have them stricken for cause, and I will make a ruling on whether or not to grant that motion. You understand?

"THE DEFENDANT: No, sir.

"THE COURT: Well, there are two types of challenges, one is the peremptory challenge which I have explained to you, of which you have twenty, for no reason at all you can challenge up to twenty prospective members of the jury. In addition to those twenty if there is a reason why that person should not serve as a juror, I will be glad to listen to that reason and make a ruling as to whether or not that person will be stricken for cause. You understand?

"THE DEFENDANT: Not completely, not right now.

"THE COURT: Well, those are your rights. If you wish to strike someone for cause, you have to tell me about it.

"THE DEFENDANT: What I want to know, what reasons are there to strike them for if I wanted to strike them?

"THE COURT: It's a question of whether there's any reason why they could not give a fair and impartial verdict in this case.

"THE DEFENDANT: Like I say, I don't fully understand.

"THE COURT: Well, I can't think of any other way to explain it to you. Do you want to talk to Mr. Sellman?

"THE DEFENDANT: No. Mr. 'Spellman' hasn't given me any advice yet, except to plead guilty.

"THE COURT: You could ask him about any of these matters. He is in the courtroom.

"THE DEFENDANT: I would like to have my private counsel, my personal counsel. I'd like to retain counsel.

"THE COURT: Well, I have explained it to you as best I can. I have previously explained to you what your alternatives are with respect to counsel. I can't do anything further.

"THE DEFENDANT: Could I make another motion with the Court? I have now been told by the Court that I represent myself. Can I request a postponement?

"THE COURT: No.

"THE DEFENDANT: That's denied?

"THE COURT: That was denied on Monday."

Subsequently the voir dire continued. When given the opportunity to have the judge propound questions to the panel for him, he repeatedly stated that he did not know of any questions, and, further, had not known that he would be required to submit in advance the questions for voir dire. When asked whether individual jurors were acceptable, he made no response. Hudson's attempt to get a delay in order to devise voir dire questions was rebuffed. His request to be permitted to question individual jurors was denied. Finally, he objected to the fact that the State, in his perception, was being allowed to select the entire jury that would try him.

It is apparent from this record that the defendant was incapable of representing himself. Moreover, it is equally apparent that the defendant himself realized that he could not adequately provide for his own defense because he continued in his attempts to secure either a delay or different counsel:

"THE DEFENDANT: I can't participate in this. I don't know what — I'm not going to participate in this because I'm not given a chance to submit voir dire questions, I don't have the information the State has about me, or the jurors, or the circumstances, and I should be equal with the State. The State has all of the postponements, all of the leisure time to prepare for trial, they've been aware of when I was coming to court, they've had time to prepare. I learn

of my trial on the day of the trial, and I'm expected to come in here and submit voir dire, not knowing what the charges are, not knowing what information

"THE COURT: Any time you want help from Mr. Sellman —

"THE DEFENDANT: Mr. 'Spellman' has refused me help already. He's already told me I don't have a defense. I asked him downstairs —

"THE COURT: Please return to counsel table. We will proceed with the selection of the jury.

"THE DEFENDANT: I am not going to participate in this trial without counsel.

"THE COURT: That's your decision.

(BENCH CONFERENCE TERMINATED)

"THE CLERK: Is Miss Nardi acceptable, Mr. Hudson?

"THE DEFENDANT: I can't participate in this because I don't know what's happening, Your Honor.

"THE COURT: Your answer will be "Yes" or "No" and no further comments.

"THE DEFENDANT: I can't participate in this, Your Honor, because you're not allowing me the same chance the State has.

\* \* \*

"THE DEFENDANT: Is it possible, once it is proven that I did retain Mr. Sherman as my counsel, that he will be allowed at trial?

"THE COURT: Mr. Sherman informed the Court that he did not represent you, and he had not entered his appearance prior to — He has not entered his appearance in this case at all. I made that determination on Monday that your attorney was the Assistant Public Defender, Alvin Sellman.

"THE DEFENDANT: I'm saying if I can show

proof that I have retained him as counsel, would he be allowed —

"THE COURT: No.

"THE DEFENDANT: Would he be allowed to be here?

"THE COURT: No.

"THE DEFENDANT: Regardless of what I do, I've got to —

"THE COURT: That's right.

"THE DEFENDANT: You know you cannot force me to take no attorney.

"THE COURT: That's right. That's the reason I'm permitting you to proceed to represent yourself.

"THE DEFENDANT: You can't force me to proceed representing myself.

"THE COURT: That's just what I'm doing. Now take your seat at the counsel table.

The culmination of the defendant's attempts to represent himself was his ejection from the courtroom. After Hudson continued to object to the State's selecting all the jurors, and failed to approach the bench when objecting, the court warned him that if he continued to misbehave, he would be removed from the courtroom. When the defendant asked, "Are you telling me that you can now have my trial without me being present?" the court responded, "If you do not behave yourself as you are required by the rules of court and by the instructions of the judge, that's exactly what I'm telling you." When the defendant continued to ask questions about the effect of being removed and to object to the method by which the jury had been selected, the court ordered that he be removed.[1]

---

1. I have doubts that the defendant's conduct was sufficiently obstreperous and disruptive that it warranted his removal according to the standard set forth in Illinois v. Allen, 397 U.S. 337, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970). Moreover, even if it did, I cannot conceive that a *pro se* defendant can be removed from the court while the proceedings are continued without at least requiring, as the court here did not do, that an attorney take over the defense and represent the defendant. Although one case of which I am aware permitted the trial to proceed without counsel after the defendant had

The remainder of the jury selection process took place without the defendant's presence and without any attorney taking his place. Moreover, while contemplating his prospects that evening, it would likely occur to Hudson that the result would be the same if he continued the attempt to represent himself at the trial. Thus, on the very next morning, he accepted the plea bargain.

When these events are viewed in their entirety, it is unreasonable to conclude that Hudson's plea was a voluntary choice among alternatives. He had none. Rather, it was the frustrated product of all of the preceding circumstances. Each step in this chain of events closed one option after another, inevitably leading Hudson to the conclusion that his only option was to plead guilty on the most favorable terms he could obtain. He had unsuccessfully attempted to retain an attorney to present a potentially valid defense to one of the charges. The only attorney available to him had no interest in presenting the defense and repeatedly advised Hudson to plead guilty. His protestations about the assigned attorney's disinterest were futile. In spite of his expressed desire for legal representation and his constant disavowal of any desire to defend himself, the trial court forced Hudson to represent himself by telling him that he had elected to do so by his prior conduct. As could only be expected, Hudson could not adequately do so. The final straw was his banishment from the courtroom without anyone to represent him.

A court should not always accept a defendant's statement on the record that his plea is voluntary and uncoerced when there are circumstances indicating that it is not. *See Blackledge v. Allison,* 431 U.S. 63, 97 S.Ct. 1621, 52 L.Ed.2d 136 (1977). Under the circumstances of the instant case, it seems clear that Hudson's guilty plea was virtually compelled by the situation resulting from the prior violations of his

---

been removed, Parker v. State, 556 P.2d 1298 (Okla.Cr.App. 1976), normally the appointment of standby counsel is required. *See, e.g.,* Badger v. Cardwell, 587 F.2d 968 (9th Cir. 1978); State v. Delvecchio, 110 Ariz. 396, 519 P.2d 1137 (1974); People v. Pearson, 52 Ill.2d 260, 287 N.E.2d 715 (1972); Commonwealth v. Africa, 466 Pa. 603, 353 A.2d 855 (1976) (dicta). *See also* Faretta v. California, 422 U.S. 806, 834 n. 46, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975).

rights. He had no effective opportunity for a full trial at which he could defend against the charge of assault with intent to murder.

Although it may be true, as the majority asserts, that one of his reasons for pleading guilty was to receive a lighter sentence, it seems obvious, under the circumstances, that the guilty plea also represented Hudson's capitulation to the fact that he could not obtain counsel to effectively defend him, that he could not do so himself, and that he had no other viable alternatives.

Finally it is clear under *North Carolina v. Alford, supra,* that when a defendant is unwilling to admit his guilt, an effective guilty plea requires a clear expression of the desire to plead guilty. The majority makes much of the fact that, when his second guilty plea was accepted, Hudson did not deny his guilt or assert that he was pleading guilty because it was part of the deal. There is nothing in the record, however, to indicate that Hudson had changed his mind or abandoned his assertion of innocence to the charge of assault with intent to murder. In fact, part of the final colloquy before sentencing reveals that his plea was not without qualification or hesitation:

> "MR. SELLMAN: Is there any complaints you had about my services? As I say, I am trying to conscientiously do what I can to help you on your behalf, to have this to work out to your satisfaction. I have done the best I could, and I want to know if you have any complaints about my services before the Court finally disposes of your case.
>
> "THE DEFENDANT: *The only complaints I had the judge ruled on,* so I've already pled guilty, *and everything the judge ruled on, I guess I am waiving that now."* (Emphasis supplied.)

Given the events that had occurred, Hudson might well have believed that it would be futile to make any further protestations of innocence or expressions that he was pleading to the assault charge only because it was part of the deal. Further, based upon his earlier experience with the first

guilty plea, he had reason to believe that any such expressions would jeopardize the court's willingness to accept the plea bargain.

If there had been no prior violations of Hudson's rights, the colloquy at the time when the second guilty plea was accepted might well have been sufficient to show the plea's voluntariness. Nevertheless, that portion of the record cannot be considered in isolation. Viewing the case as a whole, it is apparent that the guilty plea was the fruit of conceded violations of Hudson's constitutional rights. I cannot accept the notion that the defendant's mere "Yes, sir" responses to the trial judge's routine questions, under the circumstances here, broke that causal connection.

I am authorized to state that Judges Cole and Davidson concur with the views expressed herein.