ATTORNEY GRIEVANCE COMMISSION OF
MARYLAND *v.* ROBERT STEPHEN
SHERMAN

[Misc. (BV) No. 2, September Term, 1982.]

*Decided January 11, 1983.*

The cause was argued before MURPHY, C. J., and SMITH, ELDRIDGE, COLE, DAVIDSON, RODOWSKY and COUCH, JJ.

*Joseph F. Murphy, Jr.,* for respondent.

*Melvin Hirshman, Bar Counsel,* for petitioner.

RODOWSKY, J., delivered the opinion of the Court. ELDRIDGE, J., dissents and filed a dissenting opinion at page 241 *infra.*

Robert Stephen Sherman (Sherman or Respondent), a member of the Bar of this Court since 1965, excepts to findings of having violated a number of disciplinary rules. All of the factual issues revolve around whether Sherman accepted employment to represent Oliver Hudson (Oliver) in the defense of criminal charges.[1] The trial judge in these disciplinary proceedings (Karwacki, J.) concluded that Respondent had undertaken, but had not carried on, the representation. It was also found that Respondent had made willful misrepresentations to the judge in Oliver's criminal case (Ross, J.) by denying having accepted the employment and by denying having retained substantial payments to conduct Oliver's defense. There was clear and convincing evidence to support the principal conclusions of the trial

---

[1]. Hudson v. State, 286 Md. 569, 409 A.2d 692 (1979), *cert. denied,* 449 U.S. 845, 101 S. Ct. 128, 66 L. Ed. 2d 53 (1980), involved the same criminal charges.

judge.[2] We shall overrule all but one of the exceptions and shall sanction Sherman.

On December 20, 1977 Oliver was indicted for attempted robbery and assault with the intent to murder arising out of a liquor store holdup on November 29, 1977. Oliver had been shot in the head by an off duty police officer who was in the liquor store during the robbery, and Oliver had been arrested on the spot. Oliver's grandmother, Bessie Hudson (Bessie), and Oliver's brother, Mark Hudson (Mark), met with Sherman in his office on December 27 about Sherman representing Oliver. From time to time in the preceding seven years Sherman had represented other members of the Hudson family. At the time Sherman was Mark's attorney for a workmen's compensation claim which Sherman's associate was handling. Bessie testified that Respondent had said he would take Oliver's case and that his fee would be $1,500 which could be paid monthly. The amount and number of the payments were not fixed.

Sherman acknowledged there was such a meeting but denied that he had agreed to undertake the representation, because his custom has been to defer making that commitment in a serious criminal case until the client was interviewed. He also admitted that he had indicated a minimum fee would be $1,500 and that Mark had expressed a willingness to pay $500 out of the recovery on his workmen's compensation claim toward the fee in Oliver's case. Sherman opened a file under Oliver's name.

Sherman interviewed Oliver at the Baltimore City Jail on December 28 or 29. Oliver testified that Sherman at that time had said that he would represent Oliver, that a fee had been established with Oliver's family of $1,500 to $2,000, and that Oliver need not worry. Sherman's testimony, and his basic point in the instant matter, was that Oliver had made it plain in the interview that Oliver intended to direct the defense and to have Sherman knowingly present

---

2. The record made before the inquiry panel was placed in evidence in the court below. Sherman represented himself and testified before the inquiry panel and before Judge Karwacki.

perjured testimony. This had outraged Sherman who told Oliver he would not touch the case. When Respondent similarly told 'Mark, Mark urged Sherman to give Oliver one more chance. Sherman recalled that sometime before the end of the first week in January, 1978, when he had been at the City Jail to interview another client, there had been a meeting for about two minutes with Oliver. Oliver would not change his approach to the case and had told Sherman that the latter's approach was not good enough.

It is uncontroverted that when Sherman left the City Jail after the first interview, he took with him Oliver's copy of the` charging documents, a canned motion and forma pauperis affidavit which Oliver had prepared, and the original of a long-hand letter which Oliver had written to the public defender's office and which had gotten back into Oliver's possession. Sherman never entered his appearance in the criminal case. Nor did Sherman ever write to Oliver, or to any member of the Hudson family, stating that he would not undertake the representation.

On January 6, 1978 Bessie's husband delivered $200 toward fee to Sherman's office, without seeing Sherman personally. A receipt, signed by a secretary, was issued which recites $200 was received from Bessie "for Oliver Hudson." The January 1978 cash receipts journal for Sherman's general account contains an entry, in Sherman's handwriting, reading "Bessie Hudsen [sic] 200.00." Sherman testified that he had not contemporaneously associated that $200 with Oliver's case and that, had he known it was toward fee for Oliver, he would not have retained it. His explanation was that "all" the money for Hudson family matters would "always" come from Bessie. Sherman, however, did not identify the Hudson family matter to which he thought the $200 applied, if the money was not for Oliver's case.

The procedure in Sherman's office on matters in which a fee was to be paid in part payments was to record the amount of fee and payments made on a card stapled to the inside of the file cover. No such card was stapled in Oliver's file when

it was received in evidence by the inquiry panel. Office procedure additionally included preparation of an index card which would be used by the secretary as a reminder to send notices concerning the fee balance. Sherman testified that he did not believe there was such a card on Oliver's case. On the other hand, Bessie testified that she had received several letters from Sherman's secretary requesting payment toward the fee balance and that she had telephoned Sherman's secretary to advise that additional money would be paid as soon as she was in funds.

When Mark's workmen's compensation claim was settled, a nonlawyer employee in Sherman's office issued a receipt dated February 9, 1978 to Mark for $700 bearing the notation, "Oliver Hudson from Mark Hudson's W.C.C." The February 1978 cash receipts journal contains a notation, in Sherman's associate's handwriting, which reads "Oliver Hudson 700.00." This $700 consisted of $500 which Mark had originally agreed to contribute toward Oliver's defense, plus $200 which Bessie had apparently delivered to Mark to be paid toward fee. In explanation, Sherman said it has been his custom, when part of a civil recovery was to be applied by consent to an outstanding fee in a criminal case, to insert a note to that effect in the civil file. What happened, according to Sherman, was that he had forgotten to remove the note from Mark's file when representation of Oliver was rejected, so that the associate attorney automatically processed the fee.

Sherman received a letter from Oliver dated "Thur 16, 1978" [3] advising that Oliver had been transferred to the House of Correction [4] and raising a series of questions about Oliver's defense. It concluded, in part, with the statement that "I would like to follow my case at every stage of its development so that I might insure myself that I have done my best to help myself, when my trial is at end." There is no evidence that Sherman replied orally or in writing to this letter. Sherman testified, contrary to the plain language of

---

3. The 16th was a Thursday in February and in March of 1978.

4. Oliver had been on work-release under a prior sentence at the time of the crimes involved here.

the letter, that it should be read as requesting that Sherman follow Oliver's case and as a further indication that Oliver intended to direct the defense.

On April 18, 1978, Oliver sent Sherman another letter, the text of which is reproduced in the margin.[5] Sherman did not reply. He stated that he had asked his law clerk to find out what was happening in Oliver's case. It was reported to him that a public defender had entered his appearance for Oliver.

Assistant Public Defender Alvin Sellman entered his appearance for Oliver at the arraignment on June 9, 1978.

Based on Oliver's testimony Judge Karwacki found that Oliver also left telephone messages for Sherman and that Oliver on one occasion turned away a representative of the public defender who had come to the House of Correction to interview Oliver, because Oliver thought that he had private counsel.

Oliver's case was called for trial on September 11, 1978 before Judge Ross. Mr. Sellman informed the court that Oliver had that morning done an about-face and had told Sellman that he had Sherman as an attorney, to whom he had paid a fee. Oliver wanted Sherman to represent him and also wanted a postponement. In the course of the proceedings, Judge Ross sent for Sherman. The following colloquy transpired:

THE COURT: Mr. Sherman, have you been employed by this defendant?

---

5. Dear
    Sir

once more I am sending a letter to you hoping that I Will get some type of reply what I would like to know is what are your intention are Concerning my up Coming trial when ever that is and before it Comes up there are Certain Pre trial motion that I want Presented to the Court sir if you are Dis Concern with my Case as attorney and Client Relationship it's your duty to notify me as to what Procedure you intend to make so far you have not Discuss one single thing with me and I don't intend to go to trial un Prepare

I await your reply.

MR. SHERMAN: No, sir, but I have had contact with him and his family.

THE COURT: Has anyone paid you anything to represent him?

MR. SHERMAN: No, sir. There was a promise to pay at one point.

THE COURT: You have received nothing?

MR. SHERMAN: No, sir. Mr. Hudson's brother, who is known to me, had a Workmen's Compensation case, and he had promised some of the fee that I had asked could come out of that Workmen's Compensation case, which was not yet settled or resolved; however, it has been subsequently resolved, and I had learned Mr. Hudson desired the services of the Public Defender long before that matter was resolved. I never asked for any money, never received any on this case.

THE COURT: Have you ever conferred with this defendant?

MR. SHERMAN: Yes, sir, I went to — I saw him at the Baltimore City Jail. I don't have the exact date. I was looking for my notes when this came up. I had a file created with my notes in it, but it was in the winter shortly after the arrest I am sure.

The criminal case was in recess on September 12, a state holiday. On September 13 Sherman's receipts for payment were furnished by a friend of Oliver to Judge Ross who observed that that evidence "may be a matter for another day in another proceeding . . . ." Oliver subsequently pleaded guilty and the conviction was affirmed by this Court. *Hudson v. State, supra.*

In these disciplinary proceedings, Sherman testified that, while answering Judge Ross' questions, he had not been aware that he had received the $200 and $700 payments. He said that he had discovered this when he returned to his office from Judge Ross' court. Sherman never advised Judge Ross that the representations were inaccurate. Respondent

stated that he had not done so because he considered the questioning as having been directed more to whether he represented Oliver than to whether Sherman had received any payment toward fee.

Sherman arranged to have both Bessie and Mark come to his office to receive a refund. It was effected by check dated September 19, 1978, payable to Bessie. Bar Counsel's first letter to Sherman, advising of a grievance complaint, was dated September 27, 1978. Sherman did not respond in any fashion either to that letter or to a follow-up letter of October 18, 1978. His explanation was: "I was in discussion with Mark Hudson and he would ask Mrs. Bessie Hudson to withdraw the complaint, and I was told it was done."

In these disciplinary proceedings Judge Karwacki concluded "from the clear and convincing evidence that Mr. Sherman willfully misrepresented the fact that he had retained substantial payments from the family of Oliver Hudson to conduct the defense in *State v. Oliver Hudson* (a misrepresentation he attempted to cover up by returning $900 to Mrs. Bessie Hudson and Mr. Mark Hudson on September 19, 1978)." This was found to be in violation of DR 1-102 (A), subsection (4), conduct involving dishonesty, fraud, deceit or misrepresentation, of subsection (5), conduct that is prejudicial to the administration of justice, and of subsection (6), conduct that adversely reflects on an attorney's fitness to practice law. It was found that Sherman had been employed to represent Oliver in the criminal proceeding and that Sherman had "woefully failed to perform the duties" arising from that relationship. This was held clearly to violate DR 7-101 (A) (2) (intentional failure to carry out a contract of employment entered into with a client for professional services). There was a finding that Sherman, "to some degree, prejudiced and damaged his client by virtue of this failure as proscribed by DR 7-101 (A) (3) . . . ." Sherman's neglect in handling Oliver's defense was also ruled to have violated DR 6-101 (A) (3) which declares that a lawyer shall not neglect a legal matter entrusted to him. Judge Karwacki expressly disclaimed crediting Sherman's

testimony that he had decided he could not ethically continue to represent Oliver.

Respondent's exceptions initially attack the finding of willful misrepresentation. The argument is that mere disbelief on credibility grounds cannot be converted into affirmative evidence to support a finding of willfulness.

Willfulness need not be, and ordinarily cannot be, proved by direct evidence. It is a matter of reasonable inference. Sherman flatly denied to Judge Ross having accepted employment to represent Oliver. Judge Karwacki found Sherman did undertake the employment. Sherman has never asserted that he conditioned any undertaking to represent Oliver on receiving payment in advance, and in full. It was Sherman's position both before the inquiry panel and before Judge Karwacki that representation of Oliver had been tendered to him but had been rejected because of Respondent's reaction to the first interview with Oliver. However, when before Judge Ross, Sherman said that he had not represented Oliver because Oliver had desired the services of a public defender, and that Sherman had learned this before Mark's compensation case was settled. Judge Ross was also told by Sherman that no one had paid him anything to represent Oliver. Sherman then told the court below that, when he had been before Judge Ross, he simply had been unaware either of the $200 payment or of the $700 payment which had been processed automatically as a result of the memorandum placed in Mark's compensation file. But there would never have been any such notation in the file if Sherman had not accepted the employment. If, as Sherman claims, Sherman did not tell Bessie and Mark on December 27, 1977 that Sherman would represent Oliver because Oliver had not yet been interviewed, then the note would not have been put in Mark's file before Oliver's interview. If, as Sherman claims, he decided not to represent Oliver based on the interview, then the note would not have been placed in Mark's file after Oliver's interview. Further, Respondent claimed to have advised Oliver and Mark before the end of the first week in January that he would not take Oliver's

case. Yet there is no explanation why Mark, in February, paid money out of the compensation recovery toward fee for an attorney who had refused to represent Oliver. These factors, coupled with the journal entries, the unanswered correspondence from Oliver, and the law clerk's report to Sherman, which inferentially was rendered after June 9, 1978 or within about three months prior to Sherman's appearance before Judge Ross, support the fact finding that the misrepresentations were willful. From the finding of legal employment the remaining violations found by Judge Karwacki, other than under DR 7-101 (A) (3), inexorably flow as a result of Respondent's complete failure to carry out his assumed responsibilities.

However, the court below did not articulate in what way Oliver had "to some degree" been prejudiced and damaged by Sherman's inaction. Oliver was apprehended *flagrante delicto.* He was ultimately represented by a public defender and pled guilty. Bar Counsel has not presented clear and convincing evidence to support a violation of DR 7-101 (A) (3). Sherman's exception on this point is sustained, but his other exceptions are overruled.

We turn to the issue of sanction. Bar Counsel recommends disbarment because of the willful misrepresentations to a court and the virtually total abandonment of the client's cause.[6] Respondent argues, relying on *Attorney Grievance Commission v. Levitt,* 286 Md. 231, 406 A.2d 1296 (1979), that the misrepresentation, even if willful, related to a matter collateral to the proceedings before Judge Ross, a conclusion which Sherman finds reinforced by Judge Ross' not having requested Sherman to reappear in court on September 13, 1978 when Sherman's receipts for the part payments were produced. We do not agree with that anal-

---

6. Bar Counsel also places some emphasis on Judge Karwacki's characterization of the refund arrangements as a "cover up." There was no charge that the circumstances immediately surrounding the making of the refund constituted a violation of any disciplinary rule. *See* Attorney Grievance Comm'n v. Walman, 280 Md. 453, 464, 374 A.2d 354, 361 (1977), citing In re Ruffalo, 390 U.S. 544, 551-52, 88 S. Ct. 1222, 20 L. Ed. 2d 117 (1968).

ysis. Respondent is an experienced practitioner in the defense of criminal cases. Early in the representation, he had identified Oliver as a manipulator. When responding to Judge Ross, Sherman knew from the questions put to him that the problem then facing the court dealt with counsel for Oliver. Sherman's statement that he had not been employed did not relate to a collateral matter. Whether Sherman had received some payment toward fee also went to whether he had been, in fact, so employed and was not collateral.

Respondent urges that the misrepresentation, even if willful, was not for the purpose of cheating or defrauding the client or his family. Bar Counsel does not contend that Sherman intended permanently to keep the fee or any unearned portion of it. We understand the fact finding of willfulness, as applied to Sherman's denial of receiving any payment, to mean that he knew the denial to be untrue when it was made.

The picture which emerges from the record as a whole is of an attorney who agreed to represent a demanding, troublesome and poorly paying client. Sherman did not enter his appearance within five days after accepting the employment, as required by Rule 725a which had been promulgated November 4, 1977 and had become effective January 1, 1978. He seems, over a period of months, simply to have abandoned the case without ever advising his client, or his client's family, that he would no longer be responsible for the defense, and without attempting to effect a proper transition of the defense to some other attorney or to the public defender. Then, without ever having responsibly faced the situation on his own initiative, Respondent was confronted with the request to appear before Judge Ross, to whom Respondent lied in order to conceal his inaction.

In *Attorney Grievance Commission v. O'Neill,* 285 Md. 52, 400 A.2d 415 (1979) we were presented with a neophyte attorney who had lied to a judge, to an assistant state's attorney and to a probation department agent when he insisted that he had paid the court costs imposed on him as a condition of his probation in a "driving while intoxicated"

case. Because of the youth and inexperience of the attorney, his later admission to the judge of the lies on the day when they were made, and evidence of remorse, the sanction imposed was a reprimand. None of these factors are present in Sherman's case. *Levitt, supra,* involved willful misrepresentations to a circuit judge during an untranscribed hearing in chambers on a motion to dismiss an appeal from the District Court for failure timely to transmit the record. The misrepresentations concerned service of process and notices in the District Court and the ownership of the corporate appellant. Levitt was suspended for one year.

Here Judge Ross was relying on a member of the bar for honest answers which directly bore on a difficult issue in a criminal case involving serious charges. The court was entitled to candor. Oliver was entitled to performance of his attorney's duties. Sherman has previously received a dismissal with warning for neglect and incompetence in an estate matter. Under all of the circumstances, we believe that the proper sanction is for Robert Stephen Sherman to stand suspended from the practice of law in this State for the period of three years beginning 30 days from the date this opinion is filed. He shall stand suspended beyond that date unless and until all costs incurred in connection with this proceeding are paid in full.

> *It is so ordered; respondent shall pay all costs as taxed by the Clerk of this Court, including all costs of transcripts pursuant to Maryland Rule BV 15 c, for which sum judgment is entered in favor of the Attorney Grievance Commission against Robert Stephen Sherman.*

*Eldridge, J., dissenting:*

While I do not minimize the seriousness of Mr. Sherman's misconduct, I believe that a three-year suspension from the practice of law is an excessive sanction under the circumstances.

In cases involving findings of willful misrepresentations made by attorneys to courts, we have imposed a suspension of one year (*Attorney Griev. Comm'n v. Levitt,* 286 Md. 231, 406 A.2d 1296 (1979)) and a reprimand (*Attorney Griev. Comm'n v. O'Neill,* 285 Md. 52, 400 A.2d 415 (1979)). The degree of misconduct shown by the evidence in the instant case does not approach that in a recent case in which we imposed a two-year suspension, *Attorney Griev. Comm'n v. Kerpelman,* 288 Md. 341, 420 A.2d 940 (1980), *cert. denied,* 450 U.S. 970, 101 S.Ct. 1492, 67 L.Ed.2d 621 (1981), disbarment by the Supreme Court, 450 U.S. 975, 101 S.Ct. 1507, 67 L.Ed.2d 810 (1981). The *Kerpelman* case involved two different willful and deliberate misrepresentations to a client plus advising a client to violate a court order. *See also Attorney Griev. Comm'n v. Haupt,* 285 Md. 39, 399 A.2d 1350 (1979) (imposition of a ninety-day suspension upon an attorney who made a willful misrepresentation to an official in charge of a detention facility which "jeopardized the entire security system at the facility" (285 Md. at 57), and who had previously been suspended by the Court for a different violation of the disciplinary rules).

This Court has repeatedly stated that "suspension is for the protection of the public, not by way of punishment of the individual lawyer. It is protection for the public because it demonstrates the type of conduct which a court will not tolerate without sanction." *Attorney Griev. Comm'n v. Lockhart,* 285 Md. 586, 597, 403 A.2d 1241 (1979). *See also Attorney Griev. Comm'n v. Kerpelman, supra,* 288 Md. at 382. A suspension for three years is not required to demonstrate to the bar that we shall not tolerate conduct such as that disclosed by the evidence in this case.

In light of the testimony below, and our prior cases, I would suspend Mr. Sherman for a lesser period than three years.