545 A.2d 12

**ATTORNEY GRIEVANCE COMMISSION OF MARYLAND**

v.

**Jeffrey Lee GREENSPAN.**

**Misc. (Subtitle BV) No. 18, Sept. Term, 1987.**

Court of Appeals of Maryland.

Aug. 1, 1988.

Glenn M. Grossman, Asst. Bar Counsel, Atty. Grievance Com'n of Maryland, for petitioner.

Jeffrey Lee Greenspan, Bethesda, for respondent.

Argued before MURPHY, C.J., and ELDRIDGE, COLE, RODOWSKY, McAULIFFE, ADKINS and BLACKWELL, JJ.

McAULIFFE, Judge.

The petition for disciplinary action filed by the Attorney Grievance Commission in this case alleges that Jeffrey Lee Greenspan was dishonest and knowingly misrepresented facts in his dealings with First Federal Savings and Loan Association of Front Royal, Virginia (First Federal) and its agents, and thereafter in his dealings with Bar Counsel and with an inquiry panel of the Attorney Grievance Commission.

Respondent denies that he made any willful misrepresentations, and further says that any misleading communications attributable to him resulted from emotional stress associated with personal problems, or simply from carelessness. Judge John J. Mitchell, to whom this complaint was referred for hearing, found that Respondent had violated Disciplinary Rules 1–102(A)(4), (5), (6), 7–102(A)(7), and 7–102(B)(1) of the Code of Professional Responsibility, as well as Rule 8.4(c) and (d) of the Rules of Professional Conduct.[1]

---

**1.** The Code of Professional Responsibility governed the conduct of attorneys in this State until July 1, 1987. From and after that date, the Rules of Professional Conduct apply. Maryland Rule 1230. Respondent's dealings with First Federal occurred before the effective date of the change, but his appearance before the Inquiry Panel occurred after that date. The pertinent portions of the involved rules are:

Disciplinary Rule 1–102 Misconduct.

(A) A lawyer shall not:

(4) Engage in conduct involving dishonesty, fraud, deceit, or misrepresentation.

(5) Engage in conduct that is prejudicial to the administration of justice.

(6) Engage in any other conduct that adversely reflects on his fitness to practice law.

Disciplinary Rule 7–102 Representing a Client Within the Bounds of the Law.

(A) In his representation of a client, a lawyer shall not:

(7) Counsel or assist his client in conduct that the lawyer knows to be illegal or fraudulent.

(B) A lawyer who receives information clearly establishing that:

(1) His client has, in the course of the representation, perpetrated a fraud upon a person or tribunal shall promptly call upon his client to rectify the same, and if his client refuses or is unable to do so, he shall reveal the fraud to the affected person or tribunal.

Respondent filed extensive exceptions to Judge Mitchell's findings of fact and conclusions of law, essentially contending that the evidence was insufficient to support a finding of a willful violation of any disciplinary rule. We find the evidence sufficient to support Judge Mitchell's findings and conclusions, and we impose a sanction of six months suspension from the practice of law.

■ Respondent was admitted to the bar of this Court in 1974, and maintains an office for the practice of law in Bethesda, Maryland. He is also admitted to practice in the District of Columbia. For a number of years prior to 1985, he had represented Louis King in various business dealings, and in litigation. In June of 1985, Respondent received a "Notice of Assignment" from First Federal, which recited that $20,000 of the money due or to become due pursuant to a contract for the sale of property located on Aragona Drive in Oxon Hill, Maryland, had been assigned to First Federal. Attached to the notice was a copy of an assignment, by which Louis King and Associates, Inc. (King, Inc.) assigned $20,000 of the anticipated proceeds of the sale of the Aragona Drive property to First Federal, and specifically authorized Respondent to receive the funds and to pay them over to First Federal. The assignment recited that this payment was to be made pursuant to King, Inc.'s contract of November 27, 1984, with First Federal, by which King, Inc. agreed to purchase certain business property located on Marlboro Pike in District Heights, Maryland. Respondent promptly executed a written acknowledgement of receipt of the notice, and returned the acknowledgement to First Federal.

Thereafter, by letter of November 5, 1985, Mendle S. Zickefoose, a vice president of First Federal, advised Re-

Rule 8.4 Misconduct
It is professional misconduct for a lawyer to:
(c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation;
(d) engage in conduct that is prejudicial to the administration of justice.

spondent of First Federal's understanding that settlement had occurred on the Aragona Drive property on September 26, and asked that Respondent inform him why the assigned funds had not been forwarded. Some time after the letter was sent, but before December 19 of that year, Zickefoose spoke to Respondent by telephone, and again requested the funds. According to Zickefoose, Respondent did not deny having received the funds, nor did he indicate that there would be any difficulty in complying with the assignment.

Under date of December 19, 1985, a letter signed by Respondent, and on his business stationery, was sent to Zickefoose at First Federal. It read:

> In follow-up to my telephone call to your office. I have received a check for twenty thousand ($20,000) dollars in regards to Mr. Louis King's purchase arrangement with First Federal Savings and Loan Association for 6211 Marlboro Pike, District Heights, Maryland.
>
> I will deposit this money to my Escrow Account. It is requested that you provide me with all necessary papers in order that I may have this sale processed and set up for settlement. I presume that you desire an expeditious processing of this case. I will insure that Title search is ordered immediately.
>
> I will forward a copy of all documents to you for review prior to settlement. Upon your return of the documents I will have a settlement date set and notify you accordingly.

Three weeks later, Bernard Corbett, attorney for First Federal, wrote to Respondent. He forwarded a copy of a new sales contract between First Federal and King, Inc.,[2] dated January 10, 1986, and supplanting the earlier contract. The new contract provided:

> Purchaser has also deposited Twenty Thousand Dollars ($20,000.00) with Jeffrey Lee Greenspan, P.C., (Settle-

---

**2.** The new contract added Louis H. King, Jr., doing business as Angel's Night Club and Restaurant, as a guarantor of performance by King, Inc.

ment Attorney). The Twenty Thousand Dollars ($20,-000.00) is being held in Mr. Greenspan's escrow account and has been assigned to Seller by Notice of Assignment dated June 26, 1985. Upon the signing of this contract the Seller and Purchaser shall notify Mr. Greenspan to release Eleven Thousand Dollars ($11,000.00) of this money to the Seller as an additional good faith deposit. The remaining Nine Thousand Dollars ($9,000.00) shall be held in Mr. Greenspan's Trust Account and be applied toward Purchaser's settlement expenses.

*     *     *     *     *     *

Settlement is to be made at the office of the Jeffrey Lee Greenspan, P.C., or the attorney searching the title....

In his letter, Corbett referred to this language, and to the earlier assignment. He requested that Respondent "immediately send a check from your escrow account in the amount of $11,000 made payable to First Federal" and that Respondent schedule settlement for January 20 or as soon thereafter as a report of title could be secured.

In late January, Corbett and Respondent spoke by telephone. Respondent told Corbett that he did not have the $20,000—that he had sent the check back to the settlement attorney or title company. According to Corbett, when he inquired as to the name of the title company, Respondent said he could not remember, but that he thought the name contained the words "land grant." Finally, Respondent told Corbett that he had not written the letter of December 19, 1985, to Zickefoose.[3]

In fact, Respondent had never received funds from the Aragona Drive settlement. Indeed, he had not received $20,000 from any source. At some time in December of 1985, King had given his check for $20,000 to Respondent, but King at that time also told him not to deposit it because

---

3. Corbett said Respondent first told him he could not have written the letter because he was "not around at that time," but after Corbett said the signature looked like his, Respondent said "maybe I signed the letter but I didn't write the letter."

he did not have funds to cover the check. Within two to three days, King asked that the check be returned to him, and Respondent complied.

Corbett filed a complaint with the Attorney Grievance Commission, and Bar Counsel informed Respondent of the complaint. In his letter of reply, Respondent claimed that he had told Zickefoose during their telephone conversation that no settlement had taken place with respect to the Aragona Drive property, that there was a problem with the title, and that he had not received any money from the settlement attorney. Concerning the letter of December 19, 1985, he said:

> I did *not* write that letter. The letter is not written in my style, and contains numerous typographical errors. I would never permit a letter to go out of my office with the number of errors contained in this letter. (emphasis in original).

He added that the signature on the letter looked like his, but that he wished to see the original.

Testifying before the inquiry panel, Respondent again swore that he had not written the letter of December 19, and said that he had no recollection of signing it. Concerning the testimony of a certified document examiner to the effect that the signature was that of the Respondent, and that the letter had been typed on a typewriter in his office, the Respondent said, "I don't have too many good answers about that to tell you the truth." Respondent speculated that the letter may have been in a stack of letters placed before him for signature.

Testifying before Judge Mitchell, Respondent changed his tack with respect to what he had told Zickefoose during their telephone conversation. He said:

> It was my intent, before I spoke with Mr. King, to call Mr. Zickefoose and tell him exactly that I had not received the $20,000 or whatever, and I think at one point I thought, in retrospect that perhaps I had, but I, in fact—

as I think about it now, I had not. I do not dispute Mr. Zickefoose, that he was never told that by me....

Concerning the December 19, 1985, letter, Respondent acknowledged that it was on his office stationery, bore his signature, and had been typed on his typewriter. He said it was possible that he had written the letter at King's request, but that he didn't remember "because of the turmoil that was going on in my life at that time." The turmoil to which Respondent referred was the sudden death of his father on November 22, 1985, and the subsequent hospitalization and extended convalescence of his mother.

■ Judge Mitchell found that Respondent falsely represented to Zickefoose that he had the $20,000. He also found that Respondent wrote the December 19, 1985, letter, and that he intended to mislead First Federal and its attorney. He found that when confronted by Bar Counsel, Respondent "again made denials of fact that simply were untrue." Finally, Judge Mitchell found that the misrepresentations and denials were made in Respondent's capacity as an attorney-at-law.[4] We concur in these findings, and deny Respondent's exceptions. Moreover, we agree that these facts support the conclusion reached by Judge Mitchell that Respondent violated DR 1–102(A)(4), (5), and (6); DR 7–102(A)(7); DR 7–102(B)(1); and Rule 8.4(c) and (d).

### Sanction

■ Citing as precedent the cases of *Attorney Griev. Comm'n v. Myers,* 302 Md. 571, 490 A.2d 231 (1985) and *Attorney Griev. Comm'n v. Sherman,* 295 Md. 229, 454 A.2d 359 (1983), Bar Counsel recommends that Respondent be suspended from the practice of law for a period of three

---

4. Respondent has stressed throughout these proceedings that he neither asked for nor received a fee for his services to King in this matter. We think it clear that he undertook the performance of the duties of an escrow agent in his capacity as an attorney, and it is of no consequence that he was not paid a fee. *Attorney Griev. Comm'n v. Martin,* 308 Md. 272, 282–84, 518 A.2d 1050 (1987); *Central Cab Co. v. Clarke,* 259 Md. 542, 270 A.2d 662 (1970).

years. Although we agree that the violations in this case are serious, and that a significant sanction is indicated, we do not believe that a three-year suspension is required for the protection of the public, or to accomplish the objectives of general and special deterrence. We note that in *Myers* and *Sherman* the attorneys had previously been sanctioned for violations of disciplinary rules. Respondent has no previous record of violations in this jurisdiction, or in the District of Columbia.

On the other hand, unlike the cases of *Attorney Griev. Comm'n v. Maxwell,* 307 Md. 600, 516 A.2d 570 (1986) and *Attorney Griev. Comm'n v. Babbitt,* 300 Md. 637, 479 A.2d 1372 (1984), where we imposed suspensions of 90 days and 60 days respectively, we cannot say in this case that no one has suffered harm by reason of the attorney's misconduct. Judge Mitchell found, and we agree, that "King was making every effort to hold up proceedings of the transaction and he was aided and abetted by the Respondent." Because King's contract with First Federal provided for a credit against the purchase price of all rentals paid by King for the occupancy of the premises prior to settlement, First Federal was probably dissuaded from taking earlier action to evict King for nonpayment of rent by its belief that the escrow money had been paid and the contract was about to close. The record indicates that King was not making rent payments when due, and was more than $50,000 in arrears when First Federal finally learned that the escrow called for by the contract had not been provided, and evicted King from the premises.

We do note, however, that the initial serious error committed by Respondent occurred at a time when he was concededly under significant emotional pressure as a result of the sudden death of his father, the serious illness of his mother, and the responsibilities those unfortunate events placed upon him at the time. Although these factors do not constitute an excuse for conduct of this kind, they may be considered in the fashioning of an appropriate sanction. We determine that Jeffrey Lee Greenspan should stand

suspended from the practice of law in this State for a period of 180 days, beginning 30 days from the date this opinion is filed. He shall stand suspended beyond this period unless and until all costs incurred in connection with this proceeding are paid in full.

IT IS SO ORDERED; RESPONDENT SHALL PAY ALL COSTS AS TAXED BY THE CLERK OF THIS COURT, INCLUDING ALL COSTS OF TRANSCRIPTS PURSUANT TO MARYLAND RULE BV15 c AND ALL COSTS FOR EXPERT WITNESSES, FOR WHICH SUM JUDGMENT IS ENTERED IN FAVOR OF THE ATTORNEY GRIEVANCE COMMISSION AGAINST JEFFREY LEE GREENSPAN.