770 A.2d 685

**ATTORNEY GRIEVANCE COMMISSION OF MARYLAND,**

v.

**James F. CHILDRESS.**

**Misc. AG No. 22, Sept. Term, 1999.**

Court of Appeals of Maryland.

Argued May 5, 2000.

Reargued March 5, 2001.

Decided April 19, 2001.

Melvin Hirshman, Bar Counsel and Dolores O. Ridgell, Assistant Bar Counsel for the Attorney Grievance Comm'n of Maryland, for petitioner.

Joseph G. Petrosinelli, Washington, DC, for respondent.

Argued before BELL, C.J., and ELDRIDGE, RODOWSKY, RAKER, WILNER, CATHELL and HARRELL, JJ.

Reargued before BELL, C.J., and RAKER, WILNER, CATHELL, HARRELL, and LAWRENCE F. RODOWSKY (retired, specially assigned), JJ.

RODOWSKY, Judge.

This is the second time in which the instant Petition for Disciplinary Action has been before this Court. It charges the respondent, James F. Childress (Childress), with having violated Maryland Rule of Professional Conduct (MRPC) 8.4(d), prohibiting engaging "in conduct that is prejudicial to the administration of justice." The charges stem from Childress's having been found guilty in the United States District Court for the District of Maryland, Southern Division, of having violated 18 U.S.C. § 2423(b) (1994), proscribing interstate travel with intent to engage in a sexual act with a minor. We referred the disciplinary charges to Judge G.R. Hovey Johnson of the Circuit Court for Prince George's County for hearing. Because of a drafting error in 18 U.S.C. § 2423(b) as it was in effect at the time of the conduct criminally charged against Childress, the United States Court of Appeals for the Fourth Circuit reversed his conviction. *United States v. Childress,* 104 F.3d 47 (4th Cir.1996). Thereafter, Judge Johnson reported to us that Childress had violated MRPC 8.4(d) because his conduct violated 18 U.S.C. § 2423(b), notwithstanding that Childress's conviction had been reversed. Judge Johnson reasoned that the reversal had been on technical grounds unrelated to the facts of the case.

In *Attorney Grievance Comm'n v. Childress,* 360 Md. 373, 758 A.2d 117 (2000) (*Childress I*), we held that Judge Johnson

erred, inasmuch as Childress's acts "did not constitute a crime under federal law at the time he committed them," based on the Fourth Circuit's decision. *Id.* at 382, 758 A.2d at 121. We re-referred the matter, however, to Judge Johnson with the request that he consider whether the facts presented to him constituted a crime under either of two statutes, Maryland Code (1974, 1998 Repl.Vol.), § 3–831 of the Courts and Judicial Proceedings Article (CJ), prohibiting, *inter alia,* acts by an adult which render a child in need of supervision, or Va.Code Ann. § 18.2–370 (1996), the catch line description of which is, "Taking indecent liberties with children." On re-referral Judge Johnson found that Childress had violated both statutes and, thereby, MRPC 8.4(d). The matter is now again before us on exceptions by Childress to Judge Johnson's findings and, if the disciplinary charge is sustained, for imposition of an appropriate sanction.

The criminal charges involved Childress's conduct during the years 1993 through 1995 which we described in *Childress I* as follows:

"During that time Respondent used his home computer to communicate with individuals he believed to be young girls via 'chat rooms' located on America Online [(AOL)]. The girls Respondent targeted were generally between the ages of thirteen and sixteen years old. During some of these conversations, Respondent would ask whether the person was interested in meeting and having sex. For the purpose of convincing the girls to meet him, Respondent would frequently represent that he was younger than his actual age, stating that he was twenty-four years old rather than his actual age of thirty-two. He was able to persuade five young girls to meet with him. These meetings would generally occur in a public place in the Washington D.C. area. On one occasion, Respondent met two girls at the Village Center in Columbia, Maryland. The three drove around in Respondent's car. Respondent also met with a thirteen-year-old girl on three separate occasions in the Manassas, Virginia area. The two drove around and talked. During the meetings with the girls, no sexual contact ever

took place and Respondent did not engage in any conversations of a sexual nature."

360 Md. at 377, 758 A.2d at 119 (footnote omitted).

An undercover FBI Special Agent had posed as a fourteen year old girl in an AOL chat room using the screen name " 'ONE4FUN4U' " and arranged to meet Childress at the Montgomery Mall in Bethesda, Maryland. In their Internet conversations, Childress described in lurid detail the sexual activity in which he desired to engage with the putative fourteen year old when they met. At their meeting Childress was arrested.

At the hearing before Judge Johnson that formed the record for *Childress I,* Bar Counsel's case consisted of a stipulation of basic facts and excerpts from the testimony of four witnesses at the federal criminal trial, that of Childress himself, two FBI agents, and a psychiatrist, Susan Fiester, M.D. In their investigation federal agents obtained from Childress's hard drive or from disks the verbatim texts of many of his chat room conversations. These texts formed the basis for much of the examination of witnesses at the federal trial. At the hearing on re-referral Bar Counsel introduced no additional evidence to that presented for *Childress I.* In his report to us in this matter, *Childress II,* Judge Johnson rests his finding of conduct violative of the Virginia statute exclusively on the testimony concerning a thirteen year old female who used the pseudonym or screen name "JRB," and he rested his finding of conduct violative of the Maryland statute solely on the evidence concerning a fifteen year old female who used the screen name "TINA97."

I

The Maryland statute, CJ § 3–831(a), is part of the subtitle, "Juvenile Causes." The section reads:

"It is unlawful for an adult wilfully to contribute to, encourage, cause or tend to cause any act, omission, or condition which results in a violation, renders a child delinquent, in need of supervision, or in need of assistance."

In *Childress I,* we specifically directed Judge Johnson's attention to that portion of CJ § 3–831(a) dealing with a child "in need of supervision" by referring to the definition of that phrase found in CJ § 3–801(f). *Childress I,* 360 Md. at 386 n. 8, 758 A.2d at 124 n. 8. More particularly, footnote 8 in *Childress I,* drew attention to the third of four types of conduct which may give rise to a finding that a child is in need of supervision. The full text of CJ § 3–801(f) is set forth below.

" 'Child in need of supervision' is a child who requires guidance, treatment, or rehabilitation and:

"(1) Is required by law to attend school and is habitually truant;

"(2) Is habitually disobedient, ungovernable, and beyond the control of the person having custody of him;

"(3) Deports himself so as to injure or endanger himself or others; or

"(4) Has committed an offense applicable only to children."

TINA97, the subject of the finding that Childress violated CJ § 3–831, was born December 7, 1979. She engaged in chat room conversations with Childress from a computer located in her parents' home in Maryland. Childress used the screen name, "Fearlessss." There were several chat room conversations during which Childress stated that if he and TINA97 met and she liked him, they could be "physically intimate." In those conversations Childress consistently stated that he would allow TINA97 to "set the limits" because she was younger. In one conversation Childress suggested that the two could have "physical fun" if they were attracted to each other. In or about late February 1995 Childress met with TINA97 at a delicatessen in the greater Baltimore metropolitan area. TINA97 had told Childress that she would have her mother drop her off and pick her up. She also stated that she would bring a friend along. Childress discouraged TINA97 from bringing her friend because then there could be "no intimacy." Nevertheless, TINA97 brought to the meeting a

female friend who was approximately sixteen and a half years old. The three apparently engaged in benign conversation, and no sexual contact occurred.

Judge Johnson reports to us that, on re-referral, Bar Counsel argued that Childress had encouraged young teenage girls "to discuss sexual matters, agree to have sex, and then meet with [him] in person," thereby placing "the girls vulnerable to injury, danger or abuse." Referring to the conversation between TINA97 and Childress at which their meeting was arranged, Judge Johnson concluded that "Childress did in fact commit an act which encouraged TINA97 to be in need of supervision, especially in light of the fact that Childress does not dispute the two actually met in person."

The burden on Bar Counsel in a disciplinary proceeding is to prove the violation of a Model Rule of Professional Conduct by clear and convincing evidence. This standard of proof is not heightened to proof beyond a reasonable doubt where Bar Counsel's theory of the case is that a Rule of Professional Conduct has been violated by conduct which constitutes a crime, although there has been no criminal conviction. *See Attorney Grievance Comm'n v. Garland,* 345 Md. 383, 390, 692 A.2d 465, 468 (1997); *Attorney Grievance Comm'n v. Proctor,* 309 Md. 412, 418, 524 A.2d 773, 776 (1987). Here, the evidence was not sufficient to establish by clear and convincing evidence that Childress violated CJ § 3–831(a).

We said in *Childress I* that "the harm, or potential harm, in a stranger soliciting sex over the Internet to young girls, after imploring them to keep the meeting a secret from their parents, is patent." *Childress I,* 360 Md. at 386, 758 A.2d at 123. It is also clear that Childress caused TINA97 to meet with him. We shall assume that, by meeting Childress, TINA97 "[d]eport[ed] her]self so as to . . . endanger [her]self." CJ § 3–801(f)(3). Specifically, we assume that the degree of danger in the one meeting satisfies the danger element of the statute, even though the meeting was arranged for and held in a public place, TINA97 was accompanied by a slightly older female friend, and TINA97 apparently planned an exit strate-

gy by announcing in advance that her mother was furnishing her transportation. We also assume that proof of one meeting resulting from the chat room conversations satisfies the "[d]eports [her]self" element of CJ § 3–801(f)(3), inasmuch as "deports" means to "behave," "demean," or "conduct" oneself and thus carries a connotation of some regularity of conduct. Webster's Third New International Dictionary at 605.

█ Nevertheless, there is no evidence in this case, at least to the clear and convincing evidence standard, that TINA97 was "a child who requires guidance, treatment or rehabilitation," meaning guidance, treatment, or rehabilitation by the State. That finding is required in order to sustain a determination that a child is one in need of supervision. CJ § 3–801(f). That additional element is made more meaningful by considering the disposition alternatives that may result from a finding that a child is in need of supervision.

There are two priorities that govern making a disposition, public safety and "a program of treatment, training, and rehabilitation best suited to the physical, mental, and moral welfare of the child consistent with the public interest." CJ § 3–820(b). Further, § 3–820(c)(1) provides:

"In making a disposition on a petition, the court may:

"(i) Place the child on probation or under supervision in his own home or in the custody or under the guardianship of a relative or other fit person, upon terms the court deems appropriate;

"(ii) [Commit the child to the custody of a public or private agency]; or

"(iii) Order the child, parents, guardian or custodian of the child to participate in rehabilitative services that are in the best interest of the child and the family."

In *Simpson v. State,* 55 Md.App. 240, 461 A.2d 74 (1983), an adult male was charged with rendering two minor females delinquent by furnishing them beer in his home. The Court of Special Appeals reversed the conviction because a delinquent act was defined to be one which would be a crime if committed by an adult. *Id.* at 243–44, 461 A.2d at 76. As an additional

ground for reversal the court held that "the statement of facts failed to show and the trial court did not find that either child required guidance, treatment or rehabilitation." *Id.* at 244, 461 A.2d at 76. In the case before us, the findings, and indeed, the record, furnishes no information on whether TINA97 "require[d] guidance, treatment or rehabilitation." We know nothing about her home environment. There is no indication that she was actually adjudicated CINS. On the record before us it is at least equally as probable that, when the FBI investigated TINA97's association with Childress, TINA97's parents or guardian responded appropriately as it is probable that the parents or guardian were indifferent.

Accordingly, we cannot say that Childress's conduct rendered TINA97 a child in need of supervision in violation of CJ § 3–831(a), and Childress's exception to that finding of violation is sustained.

## II

The hearing judge found that there was clear and convincing evidence that Childress, by his chat room exchanges with JRB, a thirteen year old, violated Va.Code Ann. § 18.2–370A(4). That statute provides:

> "*Taking indecent liberties with children.*—A. Any person eighteen years of age or over, who, with lascivious intent, shall knowingly and intentionally:
>
> . . . .
>
> "(4) Propose to [any] child [under the age of fourteen years] the performance of an act of sexual intercourse or any act constituting an offense under § 18.2–361 . . . shall be guilty of a Class 6 felony."

Section 18.2–361 prohibits "any person" from "carnally know[ing] . . . any male or female person by the anus or by or with the mouth." There is no construction of § 18.2–370A(4) in a reported Virginia case.

Childress claims that he never intended actually to have sex with any of the teenage girls with whom he communicated via the Internet and met in person. He claims the communica-

tions and meetings were all part of an admittedly sexual fantasy upon which he never would have acted. Thus, he does not challenge Judge Johnson's finding of a "lascivious intent." His exceptions attack the sufficiency of the evidence to show (A) whether he knew that JRB was thirteen years of age and (B) whether he "[p]ropose[d]" an act of sexual intercourse as the quoted term arguably is construed by the Virginia courts.

## A

While using the screen name "Fearlessss," Childress encountered JRB in a chat room. Childress told JRB that he was "interested in having sex with a younger girl." JRB told Childress that she was a thirteen year old female. On February 25, 1994, Childress asked JRB, through some form of electronic communication, "WHAT is your 'limit' with a guy?? where do u stop his hands or mouth? im older, so i also need to know age limit for being with a man." On February 28, 1994, Childress asked, "i like energetic, passionate sex. What do you look like, and how often have you had sex??" Childress met JRB in person on three occasions. The first meeting occurred on April 9, 1994, the second during the first week of June of 1994, and the final meeting occurred on June 5, 1994. During these meetings they drove around the greater Fairfax and Mannassas, Virginia area. Childress did not touch JRB or suggest while they were together in person that they have sex. During a chat room conversation that occurred after one of the in-person meetings, Childress told JRB, "I only touch if signal lights are green." In a subsequent e-mail correspondence sent before a later meeting, JRB told Childress that if he "still wanted to, now it would be okay with her." Prior to the FBI investigation, in-person meetings between the two ceased for reasons that do not affirmatively appear in the record.

Childress's exception concentrates upon the degree of knowledge of JRB's age that is required for a violation of the Virginia statute. He argues that he "did not know, and could not have known, the age of JRB when the computer communi-

cations at issue took place."  He posits that "JRB could well have been a 55–year–old man instead of a 13–year–old girl."

Judge Johnson concluded:

"[A]  plain reading of the Virginia statute in question does not require actual knowledge of the child's age.  The unambiguous language of this section reflects that the words 'knowingly and intentionally' refer to the act of proposing an act of sexual intercourse and do not refer to whether the person committing the act has actual knowledge of the child's age."

This is a strict liability interpretation of the Virginia statute. Indeed, Judge Johnson equated this statutory crime to statutory rape in Virginia which does not require knowledge of a victim's age, by citing to *Rainey v. Commonwealth,* 169 Va. 892, 193 S.E. 501 (1937).

On the other hand, under an alternative and not unreasonable interpretation of the statute, it would require that the accused be on notice that the victim is under age fourteen.  In this case there is evidence that JRB told Childress that she was thirteen years of age.  Thus, under either of the above-discussed interpretations of the Virginia statute, Childress's exception would be overruled.

Childress, however, argues that the statute requires that the accused actually know the child's age with certainty.  He submits that inasmuch as one person ordinarily does not know whether the representations concerning personal history that may be made by another person in a chat room conversation are true, he cannot have violated the Virginia statute.

Although we have no guidance directly on point from the Virginia courts, it is clear that Virginia is a common law jurisdiction that has strong ties to the common law tradition.

Virginia Code Ann. (1994 Repl.Vol.), § 1–10 provides:

*"The common law.*—The common law of England, insofar as it is not repugnant to the principles of the Bill of Rights and Constitution of this Commonwealth, shall continue in

full force within the same, and be the rule of decision, except as altered by the General Assembly."

In *Foster v. Commonwealth,* 96 Va. 306, 31 S.E. 503, 504 (1898), the Virginia Supreme Court explained:

"Consequently, the common law of England, so far as it is not repugnant to the principles of the Bill of Rights and Constitution of this State, or has not been modified by our written law, is in full force in this State, and constitutes the rule of decision on all subjects, whether of a civil or criminal nature."

*See also Long v. Vlasic Food Prods. Co.,* 439 F.2d 229, 231 (4th Cir.1971) ("[W]here there is no Virginia law in point, the English common law applies. Virginia courts have applied [§ 1–10] to justify reliance on contemporary as well as pre-enactment common law doctrines"); *Chandler v. National R.R. Passenger Corp.,* 882 F.Supp. 533, 534 (E.D.Va.1995) ("In Virginia, the common law remains in force except where it is changed by statutory or constitutional law").

The Virginia Supreme Court frequently looks to the common law to determine the substantive elements of criminal offenses. *See, e.g., Tarpley v. Commonwealth,* 542 S.E.2d 761, 763 (2001) (relying upon common law definition of the crime of larceny); *Commonwealth v. Taylor,* 256 Va. 514, 506 S.E.2d 312, 314 (1998) (same); *Campbell v. Commonwealth,* 246 Va. 174, 431 S.E.2d 648, 652 (1993) (relying upon the common law to determine whether actual harm or prejudice to the rights of another is an element of the crime of forgery of public records); *Wackwitz v. Roy,* 244 Va. 60, 418 S.E.2d 861, 864 (1992) (concluding that suicide "remains a common law crime in Virginia"); *Weishaupt v. Commonwealth,* 227 Va. 389, 315 S.E.2d 847, 852 (1984) (relying upon the common law to determine, in context of prosecution for rape, whether a wife separated from her husband was in a different position than a wife living with her husband). Virginia Code Ann. § 18.2–370A(4) should be construed against this background.

The degree of knowledge which Childress argues to be essential to satisfying the state of mind requirement of the

Virginia statute is well out of the mainstream of the common law. R.M. Perkins, *Criminal Law* at 775 (2d ed.1969) (emphasis in the original) (footnotes omitted), explains:

" 'Absolute knowledge can be had of very few things,' said the Massachusetts court [in *Story v. Buffam,* 90 Mass. 35, 38 (1864) ], and the philosopher might add 'if any.' For most practical purposes 'knowledge' 'is not confined to what we have personally observed or to what we have evolved by our own cognitive faculties.' Even within the domain of the law itself the word is not always employed with exactly the same signification. Suppose a man has been told that a certain bill of exchange is a forgery and he believes the statement to be true. Does he have *knowledge* of this? Obviously not if the purpose of the inquiry is to determine whether he is qualified to take the witness stand and swear that the instrument is false; but if he passes the bill as genuine he will be uttering a forged instrument with 'knowledge' of the forgery if his belief is correct. The need, therefore, is to search for the state of mind, or states of mind, which the courts have spoken of as 'knowledge' for the purpose of a particular case."

It would seem to be extraordinarily unusual for the legislative body in a common law jurisdiction to create a crime which requires a scienter element that would be impossible to prove objectively in most cases.

Another common law concept, wilful blindness, also appears to have application in this situation. As defined by 1 W.R. LaFave & A .W. Scott, Jr., *Substantive Criminal Law* § 3.5, at 306–07 (1986) (quoting G. Williams, *Criminal Law: The General Part* 157, 159 (2d ed.1961)), one engages in " 'wilful blindness,' 'where it can be said that the defendant actually knew,' " when that person " 'has his suspicion aroused but then deliberately fails to make further inquiries because he wishes to remain in ignorance.' "

Subsection A(5) of the Virginia statute has been applied in *Bloom v. Commonwealth,* 34 Va.App. 364, 542 S.E.2d 18 (2001). That subsection, in context, reads:

"Any person eighteen years of age or over, who, with lascivious intent, shall knowingly and intentionally

. . . .

"(5) Entice, allure, persuade, or invite any [child under the age of fourteen years] to enter any vehicle, room, house, or other place, for any of the purposes set forth in the preceding subdivisions of this section . . . shall be guilty of a Class 6 felony."

Bloom, a twenty-eight year old male, communicated with a thirteen year old female over the Internet. The victim's mother complained to the police who logged onto the Internet using the victim's screen name to send a message to Bloom. He proposed that they meet and have sexual relations. A specific time and place were established, and the defendant was arrested when he arrived. On appeal of his conviction for attempting to violate subsection A(5) of the Virginia statute, Bloom claimed that he could not properly "be convicted because it was impossible to entice a child to engage in sexual acts when he communicated with" a detective and not the victim. *Bloom*, 542 S.E.2d at 21. The court found that it was sufficient that "defendant thought he was communicating with a young girl with whom he intended to have sexual relations." *Id.* at 22. The court rejected Bloom's impossibility defense to the attempt crime, reasoning that "[i]f the defendant intends to violate the law and, but for some impediment, would complete the unlawful act, then he is guilty of the attempted crime." *Id.* Thus, in *Bloom* the court applied "knowingly" in the introduction to all subsections of § 18.2–370A to include that which had been represented to Bloom in the Internet communication. Although the argument that certain knowledge is required was not made in *Bloom*, the result in that case seems to be inconsistent with the construction of § 18.2–370A's "knowingly" requirement that Childress advances.

■ For the foregoing reasons we conclude that the Supreme Court of Virginia would construe § 18.2–370A(4) not to require the prosecution to prove that the accused knew with certainty that the victim was under the age of fourteen.

**B**

Childress also argues that he did not "[p]ropose" sexual intercourse to JRB as the quoted word is used in § 18.2–370A(4). The argument is based entirely on the applicability to this case of the holding in *Ford v. Commonwealth,* 10 Va.App. 224, 391 S.E.2d 603 (1990). *Ford* is inapplicable.

That case was a prosecution for solicitation of oral sodomy under Va.Code Ann. § 18.2–29, which reads: " 'Any person who commands, entreats or otherwise attempts to persuade another person to commit a felony, shall be guilty of a Class 6 felony.' " *Ford,* 391 S.E.2d at 604. In *Pedersen v. City of Richmond,* 219 Va. 1061, 254 S.E.2d 95 (1979), the Supreme Court of Virginia had construed § 18.2–29 to require that the act of solicitation "be done with the intent 'to induce another to act.' " *Ford,* 391 S.E.2d at 604. Ford approached two female college students who were seated in the front seat of an automobile, with the driver's window open, while the vehicle was standing in the drive-through service lane of a fast food restaurant. Ford mumbled something, causing the driver to ask Ford what he wanted. In language less eloquent then we use here Ford replied that he wanted to perform cunnilingus on the driver. The Court of Appeals of Virginia reversed Ford's conviction, finding that his "statements were no more than the expression of his own desire and did not constitute a command, entreaty or attempt to persuade" either occupant of the automobile to engage in oral sodomy. *Id.* at 605.

*Ford* is inapplicable because, as Judge Johnson concluded, § 18.2–370A(4) makes criminal the mere act of proposing sexual intercourse where the one to whom the proposition is submitted is a child under fourteen years of age. In any event, there was sufficient evidence to prove that Childress intended to induce JRB to consent. Childress consistently maintained at his criminal trial that he would not actually have had sexual intercourse with JRB or any of the other victims, but he acknowledged that having a young girl meet with him after he had proposed intimacy increased the reality of his

fantasy. Finally, there was evidence that JRB was persuaded. Childress testified that "she gave me the green light before we met."

█ We overrule Childress's exceptions to the finding of violation of the Virginia statute and, as a result, we overrule his exception to the finding that he violated MRPC 8.4(d).

### III

Bar Counsel recommends that we suspend Childress for one year and that his readmission be conditioned upon payment of costs, continued psychiatric treatment, and quarterly reports from the treating psychiatrist to Bar Counsel for a period of two years following the termination of his suspension. Childress, arguing that he has been rehabilitated, submits that a reprimand is the appropriate sanction. We have frequently followed Bar Counsel's recommended sanction and, as explained below, we perceive no reason to reject the substance of that recommendation in this case. *See, e.g., Attorney Grievance Comm'n v. Middleton,* 360 Md. 34, 50, 756 A.2d 565, 574 (2000); *Attorney Grievance Comm'n v. Kolodner,* 321 Md. 545, 546–47, 583 A.2d 724, 725 (1991); *Attorney Grievance Comm'n v. Sinclair,* 299 Md. 644, 650, 474 A.2d 1338, 1341 (1984).

█ The purpose of disciplinary proceedings is to protect the public and preserve public confidence in the legal system, not to punish the errant attorney. *Garland,* 345 Md. at 397, 692 A.2d at 472. Nevertheless, concepts of general and specific deterrence are consistent with the primary goal of disciplinary proceedings. *Attorney Grievance Comm'n v. Protokowicz,* 329 Md. 252, 262–63, 619 A.2d 100, 105 (1993); *Attorney Grievance Comm'n v. Owrutsky,* 322 Md. 334, 355, 587 A.2d 511, 521 (1991); *Attorney Grievance Comm'n v. Alison,* 317 Md. 523, 540–41, 565 A.2d 660, 668 (1989). In *Proctor, supra,* we quoted what Judge Digges said for the Court in *Maryland State Bar Ass'n v. Agnew,* 271 Md. 543, 549, 318 A.2d 811, 814 (1974):

"'A court has the duty, since attorneys are its officers, to insist upon the maintenance of the integrity of the bar and

to prevent the transgressions of an individual lawyer from bringing its image into disrepute. Disciplinary procedures have been established for this purpose, not for punishment, but rather as a catharsis for the profession and a prophylactic for the public . . . .' "

*Proctor,* 309 Md. at 419, 524 A.2d at 776.

█ Here, Childress's misconduct seriously undermined public confidence in the legal profession. The public is becoming increasingly aware that preying by adults on children via the Internet is a grave social problem. Imposition of a penalty more significant than a reprimand is needed to deter similar future conduct by this respondent and to serve notice on the members of the Bar at large that this type of conduct by an officer of this Court will not be tolerated.

In addition to the harm caused by Childress's conduct, we must also consider certain circumstances, present in this case, that mitigate the sanction. Childress has been a member of the Bar for more than ten years and this is the first disciplinary proceeding initiated against him. Further, from his arrest in 1995, Childress has acknowledged that his conduct was inappropriate and expressed remorse. He began weekly psychiatric counseling in June 1995 and was medicated. By December 1999 both therapies could be considerably reduced.

Doctor Susan Fiester, a board-certified psychiatrist, testified in the criminal proceedings and also before Judge Johnson. She stated that at various times throughout his life Childress has suffered from major depressive episodes and, since age eleven, continually suffered from obsessive compulsive disorder. During the period of the chat room conversations he was also suffering from tinnitus, a ringing in the ears. The most significant part of Dr. Fiester's testimony described the progress that Childress has made and his compliance with a program to prevent future misconduct.

Fiester labeled Childress's treatment a "rousing success." She described him as "a different person" in comparison to when she first met him. There has been a "tremendous decrease in his obsessive-compulsive symptoms" but she ad-

mitted that Childress "still has a few anxieties." She opined that there was "an insignificant risk" that Childress would again engage in behavior similar to that underlying the charges before us. Fiester also explained that Childress does not meet the DSM–IV criteria for pedophilia or any other sexual disorder.

Childress is now married and, according to all the testimony, engaged in a normal and healthy sexual relationship with his wife.

Apparently because of the relatively recent advent of the Internet technology we have not found a disciplinary action precedent involving sexual chat room conversations with minors followed by in-person meetings. There are numerous cases in which attorneys engaged in sexual misconduct with children which provide some guidance as to the appropriate sanction to impose here.

In *Attorney Grievance Comm'n v. Mitchell*, 308 Md. 653, 655, 521 A.2d 746, 748 (1987), we followed Bar Counsel's recommendation and indefinitely suspended an attorney who had been convicted of a second degree sexual offense because he performed sexual acts on a thirteen year old boy. There the evidence showed that the attorney was a "compulsive homosexual pedophiliac" and, despite extensive treatment, his behavior proved to be "impulsive and beyond his power to control." *Id.* at 654, 521 A.2d at 747.

Cases from other jurisdictions involving sexual misconduct by attorneys with minors include: *In re Safran*, 18 Cal.3d 134, 133 Cal.Rptr. 9, 554 P.2d 329, 329–30 (1976) (attorney convicted of molesting child under eighteen, order suspending him from practice for three year period stayed, placed on probation under "intense supervision" of State Bar for that period); *In re Conn*, 715 N.E.2d 379, 382 (Ind.1999) (attorney suspended for minimum of two years subsequent to conviction for sexual exploitation of minors with right to seek reinstatement at end of two year period); *In re Wells*, 572 N.E.2d 1290, 1293 (Ind.1991) (lawyer who met with male high school students in his office on a Saturday night, conversed with them about

sexual matters, showed them a videotape depicting men and women engaged in sex acts, and touched young men between the ages of sixteen and eighteen suspended for three years); *Iowa Supreme Court Bd. of Prof'l Ethics & Conduct v. Blazek*, 590 N.W.2d 501, 504 (Iowa 1999) (indefinite suspension with no possibility of reinstatement for two years for attorney who sexually assaulted eleven year old nephew); *In re Herman*, 108 N.J. 66, 527 A.2d 868, 871 (1987) (attorney suspended for three years for sexual assault of ten year old boy); *In re Wong*, 275 A.D.2d 1, 710 N.Y.S.2d 57, 61 (2000) (attorney publicly censured for his pre-admission sexual touching of a ten year old female); *Office of Disciplinary Counsel v. King*, 37 Ohio St.3d 77, 523 N.E.2d 857, 860 (1988) (attorney suspended for one year for engaging in sexual relations with fifteen year old girl). Unlike the cited cases, Childress did not sexually touch the victims involved in this case.

In light of all of the circumstances, including the recommendation of Bar Counsel, we shall order that James F. Childress be indefinitely suspended from the practice of law in this State, without the right to apply for the termination of the suspension for a period of one year from the effective date of this suspension. Any application for termination of the suspension shall address Childress's then current psychiatric evaluation and describe any psychiatric treatment since the hearing before Judge Johnson. This suspension shall take effect thirty days from the date this opinion is filed.

*IT IS SO ORDERED; RESPONDENT SHALL PAY ALL COSTS AS TAXED BY THE CLERK OF THIS COURT, INCLUDING THE COSTS OF ALL TRANSCRIPTS, PURSUANT TO MARYLAND RULE 16–715(c) FOR WHICH SUM JUDGMENT IS ENTERED IN FAVOR OF THE ATTORNEY GRIEVANCE COMMISSION OF MARYLAND AGAINST JAMES F. CHILDRESS.*

CATHELL, J., Dissenting and Concurring.

I agree with the majority's determination that Childress has violated MRPC 8.4(d), based upon the applicability of the

Virginia statute. I disagree with the majority's holding that Childress did not violate the provisions of CJ section 3–831. I also disagree with the sanction imposed in this case.

In respect to CJ section 3–831, the majority holds, in effect, that the evidence did not support a finding that Childress had performed acts rendering the child there at issue in need of supervision. The majority states: "Nevertheless, there is no evidence in this case, at least to the clear and convincing evidence standard, that TINA97 was 'a child who requires guidance, treatment or rehabilitation.'" Accordingly, says the majority, a determination that she needed supervision could not be made.

My disagreement is simple and, I believe, self-evident. In my view, a child fifteen years of age or younger, who engages over the Internet with older men, or with total strangers for that matter, for the purpose of exploring the possibility of meeting and becoming sexually intimate with that stranger, is in need of guidance. I simply cannot comprehend how any person can conclude otherwise.

My greatest disagreement, however, is with the majority's position in respect to the sanctions imposed, even for the one violation the majority has determined occurred. Today the majority says that an adult sexual predator who has used the Internet as a means to entice young females away from their homes and families to meet with him for sexual purposes, and has actually met with those young girls for sexual purposes, is, or may be after a period of suspension, fit to practice law and has not engaged in conduct prejudicial to the administration of justice. The majority, given that the oft-stated primary function of attorney disciplinary proceedings is to protect the public, in essence holds that it is more important to protect the general public in respect to their money matters, than in respect to their children.

In *Attorney Grievance Commission v. Ezrin,* 312 Md. 603, 541 A.2d 966 (1988), we disbarred an attorney for embezzling over $200,000 from his firm. In *Attorney Grievance Commission v. Hollis,* 347 Md. 547, 702 A.2d 223 (1997), we disbarred

an attorney for misappropriating over $80,000. In *Attorney Grievance Commission v. White,* 328 Md. 412, 614 A.2d 955 (1992), an attorney misappropriated approximately $14,000 of a client's money. Although he replaced the money prior to any complaints being filed against him, we still had him disbarred. In *Attorney Grievance Commission v. Sabghir,* 350 Md. 67, 710 A.2d 926 (1998), a reciprocal case, we disbarred an attorney for misappropriating $14,000 and for other acts of fraud relating to money. We disbarred the attorney in *Attorney Grievance Commission v. Williams,* 335 Md. 458, 644 A.2d 490 (1994), for several infractions, including the misappropriation of $4,966.40. In *Fellner v. Bar Association,* 213 Md. 243, 131 A.2d 729 (1957), we disbarred an attorney for using slugs in place of quarters in parking meters.

Steal money, you are disbarred. Steal a quarter's worth of parking time and you are disbarred. Forever steal a child's innocence and you're suspended. In my view, the Court has a serious problem with its priorities. I would disbar the respondent.

Items admitted into evidence before the trial court in this disciplinary proceeding [1] were excerpts from the testimony of the respondent in his criminal case, *United States v. Childress* (CRDKC 95–0213); a transcript of the testimony of FBI special agent Patricia Ferrante's testimony in *that case;* excerpts of the testimony of FBI special agent Mark Pollitt's testimony in *that case;* a transcript of the testimony of Dr. Susan Fiester's testimony in *that case;* Stipulated Findings of Fact; and summaries of FBI interviews.

In the original hearing, the trial court, based upon the evidence submitted to it, made the following findings, especially relevant, I believe, to the matter of sanctions: (1) respondent was arrested in the Montgomery Mall by federal agents and charged with Interstate Travel with Intent to Engage in a Sexual Act with a Minor; (2) he was found guilty of that

---

1. When referring to hearings in this matter, I refer to both the original hearing, and the hearing on remand.

offense in a jury trial in a federal court; (3) he received a sentence of five months and a substantial fine and an extensive period of supervised probation; and (4) that the conviction was overturned on a technicality (*i.e.*, Congress had made an inaccurate statutory reference).

Additionally, the trial court made the following findings in respect to the actual conduct of respondent: (1) between 1993 and April of 1995, he used his home computer to intentionally communicate over the Internet with females he believed to be under the age of consent, and who were previously unknown to him; some of these communications involved graphic conversations regarding sex, *i.e.*, orgasms, etc; (2) he would represent that he was younger than his actual age, for example that he was twenty-four when he was actually in his thirties; and (3) that he would ask females who he thought to be minors, and in most cases were minors, if they wanted to meet with him for the purposes of having sex. If the female, who he believed to be a female, and who he believed to be under the age of consent, indicated that she wanted to have sex with him, he would arrange a meeting. The trial court's findings also included that he actually met with at least five of these females whom he believed to be, and were, females of minor age and whom he had made arrangements to meet for sexual purposes. On at least one occasion, he drove from his home in Virginia to the Village Center in Columbia, Maryland, and met with two of such children. On three other occasions, he met with a child whom he had arranged to meet for sexual purposes knowing she was only thirteen years of age.

There was no evidence that actual sexual activities took place on any of the occasions; [2] the respondent denied any

---

**2.** This finding is based on respondent's statements and the statements of the young girls. It would be speculation to suggest that both he and the minor girls had reasons not to admit to having sex, even if it had occurred. His reason is obvious. One could speculate that the minor girls would not want their parents to know of any sexual acts that did occur. What is clear is that he met with the girls, and they, with him, for sexual purposes, and that he made sure that he was in possession of safe sex-devices when meeting with the girls.

sexual activity, as did the young girls. At all times, however, when he was to meet with the children, he especially arranged to take with him a "safe-sex kit." It contained condoms, dental dams, latex gloves, alcohol, and hydrogen peroxide. The trial court found, and respondent "testified he would fantasize about minor females and sought them out via the Internet because they were 'non-judgmental' and less likely to carry STD's."

At the first hearing, the trial court found that there was clear and convincing evidence that respondent committed criminal acts under the federal statute, when crossing state lines into Maryland with the intent to commit a sexual act with a minor, even if the sexual act was not consummated. Because the conviction of the federal violation was reversed due to a technical mistake in the drafting of that statute, we remanded the case to the hearing judge for further consideration as to whether respondent had committed other criminal offenses or sanctionable acts.

There are additional cases indicating the types of sanctions we have imposed for conduct I believe to be less egregious than the conduct in the present case. In *Attorney Grievance Commission v. Breschi,* 340 Md. 590, 667 A.2d 659 (1995), we suspended an attorney for six months for willful failure to file tax returns. In *Attorney Grievance Commission v. Gilbert,* 356 Md. 249, 252, 739 A.2d 1, 3 (1999), we suspended an attorney for thirty days for possession of crack cocaine. In *Attorney Grievance Commission v. Garland,* 345 Md. 383, 692 A.2d 465 (1997), we suspended an attorney indefinitely (with right to reapply after six months) for failure to report to court-ordered DWI clinic. In *Attorney Grievance Commission v. Protokowicz,* 329 Md. 252, 619 A.2d 100 (1993), we suspended an attorney indefinitely (with right to reapply after one year) for breaking and entering. In *Attorney Grievance Commission v. Lazerow,* 320 Md. 507, 578 A.2d 779 (1990), we disbarred an attorney for misappropriation of a home purchaser's money. In *Attorney Grievance Commission v. Greenspan,* 313 Md. 180, 545 A.2d 12 (1988), we suspended an attorney for six months for making false representations to

savings and loan institution. In *Attorney Grievance Commission v. Proctor,* 309 Md. 412, 524 A.2d 773 (1987), we suspended an attorney for one year for possession of controlled dangerous substances. In *Attorney Grievance Commission v. Silk,* 279 Md. 345, 369 A.2d 70 (1977), we disbarred an attorney for misappropriation or embezzling funds of a "Fathers Club." In *Maryland State Bar Ass'n v. Hirsch,* 274 Md. 368, 335 A.2d 108 (1975), *cert. denied,* 422 U.S. 1012, 95 S.Ct. 2638, 45 L.Ed.2d 676 (1975), we disbarred an attorney for bribery. In *Maryland State Bar Ass'n v. Agnew,* 271 Md. 543, 318 A.2d 811 (1974), we disbarred an attorney for willful evasion of income taxes. And last, but not least, in *Fellner v. Bar Association of Baltimore City,* 213 Md. 243, 131 A.2d 729 (1957), we disbarred an attorney for inserting slugs into parking meters. Respondent's misconduct is far more serious than the types of misconduct next above mentioned.

In my view, this Court should recognize by sanction, as well as words, the very real dangers inherent in the use of the Internet by sexual predators, and at least act to ensure, as far as possible, that these predators are not attorneys. Respondent's conduct is, in my view, more serious, and much more dangerous to the public, than income tax evasion, making false statements, embezzlement of a civic club's funds, simple possession of controlled dangerous substances, using slugs in parking meters, and the like.

The act of a man in his thirties, trained in the law, using the Internet to attempt to arrange criminal sexual liaisons with minor children, then crossing state lines to meet girls he believes to be under the age of consent, or who are juveniles, and who, for the most part are under the age of consent, or are minors, for the purpose of furthering criminal activity of a sexual nature, of necessity, involves the attempt to commit base and vile acts of depravity. More important, in my view, his conduct in contacting the juvenile girls and enticing them to meet with him for sexual purposes, constituted acts that helped place the girls in need of guidance, in respect to the very real dangers the majority, by its words, if not its sanc-

tion, acknowledges are created by this Internet facilitated "grave social problem."

In *Walker v. State,* 363 Md. 253, 768 A.2d 631 (2001), this Court recently upheld the felony conviction and sentencing of a twenty-nine year old man for having sex with a fourteen-year-old girl when the man had a legitimate "mistake of age" defense: the girl had told him she was seventeen, she was working in the same store he worked in and the store had a minimum age requirement of seventeen. In the case *sub judice,* Childress actively sought out girls under the age of consent. His situation involved no mistake, it was intentional. Yet he can, after a period of time, move to have his suspension lifted. I fail to see "justice" in a system that sustains the felony conviction of a person who engages in sex with a person he genuinely, but mistakenly, believes is of age, yet declines to disbar a lawyer/sexual predator who intentionally and knowingly seeks out children under the age of consent, or who are minors, for sexual purposes. Something is seriously out of kilter when such a situation is permitted to exist.

In *Garnett v. State,* 332 Md. 571, 587, 632 A.2d 797, 805 (1993), in affirming a statutory conviction under Article 27, section 673, we noted that the statute was "designed to protect young persons from the dangers of sexual exploitation by adults, loss of chastity, physical injury, and, in the case of girls, pregnancy." [3] In *Owens v. State,* 352 Md. 663, 680–81, 724 A.2d 43, 51–52 (1999), Judge Chasanow, writing for the majority, recently stated: "Indeed, it is hard to imagine when a defendant, necessarily four years older than the victim under § 463(a)(3), would be 'morally blameless' when he or she engages in sexual intercourse with a child as young as age 13." In the present case, unlike *Garnett* and *Owens,* where mistake of age was an issue, there is no mistake. Childress was, in fishing vernacular, trolling on the Internet for only one

---

3. I would, had I been on the Court at that time and agreed with the majority opinion, have included that "pregnancy" was also a concern of boys, at least should be a concern of boys, as well as a concern of the parents of boys.

species of fish—female children either under the age of consent or juveniles in obvious need of guidance that would make them aware of the dangers Childress, and others like him, presented. He found them, arranged meetings, took steps to consummate the end result of his illegal activities, but failed (perhaps) for reasons unknown, to have sexual intercourse, or engage in sexual acts with the girls. He was nonetheless hunting for legally forbidden fruit. The hunting itself, in my view, sufficiently warrants the sanction of disbarment.

I know of no person that would, under present day circumstances, say that respondent's conduct is less serious than putting quarter slugs in parking meters. Yet, respondent receives a sanction that permits, or may permit him to return to the practice of law. He has, in my opinion, already brought great shame to the profession of law. If sexual predators, especially those actively seeking to sexually abuse children, are permitted to be members of our profession, it will be difficult to continue to maintain, as we have for centuries, that we are an honorable profession. Respondent shamed our profession. The majority, in my view, perpetuates that shame with the imposition of what, under the circumstances, is a lenient sanction.

In my view of the present world we live in, sexual predators who are permitted to remain as attorneys potentially are more damaging to the image of the profession and more dangerous to the public,[4] than most of those we have disbarred, and all of those on whom we have imposed lesser sanctions.[5] This case

---

4. I realize that there is no evidence that he was successful in his endeavor to have sexual relationships with children. The evidence is, nonetheless, clear that such relationships were intended by the respondent. The mere fact that he made no "kill" should not be considered as a mitigating factor. Even a lion, I am told, misses in four out of five hunts. Nonetheless, the lion remains a lion. Childress remains a sexual predator. With the majority's action, a sexual predator who preys on young girls may, all too soon, again be a practicing lawyer.

5. Had I the opportunity, I would have voted to disbar the attorney in *Attorney Grievance Commission v. Mitchell*, 308 Md. 653, 521 A.2d 746 (1987), who had been convicted of a second degree sexual offense for

involves an adult's repeated attempts to engage in improper and sometimes illegal and criminal sexual activity with children. Now is the time to say that there are certain sexual practices *involving children* that will forever bar a person from membership in the heretofore honorable profession of law.

Respondent's misconduct seriously undermined public confidence in the legal profession. The public is becoming increasingly aware that adults preying on children via the Internet is a grave social problem. Imposition of a sanction more significant than an indefinite suspension for a period of one year is needed to deter similar future conduct by this Respondent and to serve notice on the members of the Bar that this type of conduct by an officer of this Court will not be tolerated.

With its lenient sanction, the majority equates the attempts of respondent to illegally sexually prey upon young children, with an attorney who was suspended for consensually spanking *adult* women. *See Attorney Grievance v. Goldsborough,* 330 Md. 342, 624 A.2d 503 (1993). In other words, attempts to corrupt children are no more serious than spanking consenting adults and are no more serious than putting twenty-five cent slugs in parking meters.

I would disbar him in a second.

Judge RAKER joins in the views expressed herein.

---

performing sexual acts on a thirteen-year-old boy. The present case is the second case in which this Court has imposed less than the maximum sanction of disbarment of an attorney who has sexually preyed upon children. This case, like *Mitchell*, will, regrettably, subsequently be used to justify lessor sanctions in similar cases in the future.